[No. C005722. Third Dist. Nov. 25, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY LOUIS KING, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, IV, V, and VI.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van De Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Michael J. Weinberger and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

## DAVIS, J.—

### Introduction

Defendant Anthony Louis King appeals following his convictions for the murders and robberies of Steve Patton and Raymond and Dawn Rogers. The crimes occurred over Labor Day weekend in 1987. Kenneth Bivert fired the shot which killed Steve Patton in the early morning hours on Sunday; both Bivert and defendant shot the Rogerses the following Tuesday. Defendant did not deny being present when Patton was killed and then taking his money and truck or that he shot the Rogerses and then took their money and car. He contended that he acted out of fear of Bivert, who was portrayed by the defense as a disturbed, physically imposing young man who became increasingly violent and both homicidal and suicidal in the month before Labor Day.

We reject defendant's claims of error and affirm. In the published portion of the opinion we hold that the trial court did not err by failing sua sponte to instruct the jury that an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and felony murder.

### Factual and Procedural Background

On February 5, 1988, defendant was charged with three counts of violating Penal Code section 187[2] for the September 6, 1987, murder of Steven Patton (count 1) and for the September 8, 1987, murders of Raymond and Dawn Rogers (counts 3 and 5). Defendant was charged with three counts of robbery in connection with each of the murders (counts 2, 4 and 6). Special allegations of personal use of a firearm within the meaning of sections 12022.5 and 1203.06 were charged for the murders and robberies of the Rogerses (counts 3-6). Two felony violations of grand theft-firearm of the personal property of Kenneth Griffin were also charged. (§ 487, subd. 3)

Defendant pled not guilty to all counts and denied the enhancements. The trial was held June 7 through July 8, 1988.

Kenneth Bivert, who was initially called as a witness for the prosecution, refused to be sworn or to testify. The court directed him to answer and informed him of the consequences of a finding of contempt. The court eventually found Bivert to be unavailable to testify and allowed his preliminary hearing testimony to be read to the jury. Included in the preliminary

---

[2]All subsequent undesignated statutory references are to the Penal Code.

hearing testimony presented to the jury was Bivert's statement that he had not yet been sentenced and that he "hoped" that testifying would help him to receive a more favorable sentence. He stated that this hope had nothing to do with the substance of his testimony. Bivert was extensively cross-examined during the preliminary hearing.

The defense also called Bivert as a witness. Out of the jury's presence, Bivert was returned to court and again declined to take the oath or to testify. The court granted defendant's request that Bivert be viewed by the jury and that his weight and measurements be determined and presented to the jury. The jury was informed that Bivert was approximately 6 feet 1 inch tall and weighed approximately 240 pounds.

Defendant, at trial, and Bivert, at the preliminary hearing, testified in a generally consistent manner regarding the details of the weekend and the crimes. Their testimony differed on the issues of intent and the existence of threats of harm from Bivert to defendant. Bivert denied that he had threatened defendant at any time during the Labor Day weekend, prior to or after any of the shootings.

## MURDER OF PATTON

Steve Patton was murdered in the early morning of September 6, 1987, while fishing at Portuguese Bend near Knights Landing. He arrived late Saturday evening in his pickup truck. Defendant and Bivert were spending the night on the river, drinking a case of beer and shooting guns. Defendant brought his .12-gauge shotgun and Bivert brought his .22-caliber revolver. On three occasions that evening, they talked and drank beer with Patton as he fished. After their second visit, David Garske, Ruiz and other friends arrived at the bend. After the Garske group left, defendant and Bivert returned to Patton and Bivert shot him with defendant's shotgun.

At the preliminary hearing, Bivert testified that, although it was his idea to take Patton's truck, defendant agreed to do it. They thought about hot-wiring the truck, which defendant said he could do if it did not have locked steering. They both looked at Patton's truck and found that it had locked steering. They agreed to steal the truck before Garske and his friends arrived. Bivert testified that "we said [to Garske] that we were going to take it or we were going to shoot him." After Garske responded, "oh, sure", Bivert said "we" are serious. Bivert said to defendant, "Let's go [to Patton]" but defendant refused. When Bivert asked defendant if he was going to chicken out on him, defendant said no and they left. Garske's group left while he and defendant were walking away. Defendant and Bivert returned to Patton and shortly

thereafter Bivert shot him. Defendant took Patton's wallet and keys and pushed his body into the river. Bivert did not tell defendant to take Patton's wallet or the keys to the truck. Both he and defendant then threw Patton's fishing equipment in the water and took the truck. They drove the truck for about an hour before driving it into the slough to conceal it.

On cross-examination, Bivert stated he was not serious when he told Garske about shooting Patton, that they had all treated it like a joke, and that he never made a conscious decision to shoot him. He stated that there was no plan to steal a car to rob a bank before going to Portuguese Bend.

### Defendant's Testimony Regarding Patton

Defendant testified about his general fear of Bivert prior to Labor Day weekend.[3] Bivert had never threatened him before that weekend. Defendant was generally afraid of Bivert and tried to avoid him. He was afraid Bivert might kill him because he would wave his .38-caliber revolver in people's faces. He and Bivert were part of a larger group who planned to spend the night at Portuguese Bend, but the other friends decided not to go.

The firing pin on Bivert's .22-caliber revolver broke that night. By the time Garske came to the beach, there was no more ammunition. Defendant testified that before Garske's group arrived, Bivert asked him if he wanted to get Patton's truck and go joyriding. Defendant said no, but they discussed hot-wiring it. Although they looked at the truck to see if it had locked steering, defendant did not agree to take it.

When Garske arrived, Bivert discussed robbing a bank and getting Patton's truck. Defendant also testified that when Bivert said he would shoot Patton if he did not give him the truck, he and Garske had responded, "sure." Defendant believed Bivert was joking. Defendant recalled Bivert asking him if he was going to chicken out, but he did not recall responding to this

---

[3]Defendant's generalized fear of Bivert was based on his violent behavior with smaller kids; his increasing drug and alcohol use; his talk of suicide; and the fact that he usually carried a knife and a .38-caliber revolver with him. Bivert also spoke frequently about robbing a bank. About a month before Labor Day weekend, defendant had heard rumors that Bivert had killed someone. He never heard that Bivert had talked about cutting people up and showing their body parts. Bivert told him that if he robbed a bank and got caught, he would shoot himself. Bivert also spoke of robbing local markets. In early August, Bivert wrote a will which he showed to defendant and then dropped it into an opened wall at defendant's house. Defendant's father found this will in the wall while performing renovations to defendant's bedroom. Other witnesses confirmed Bivert's violence and his preoccupation with robbing a bank.

question.[4] The Garske group decided to leave if they were going to do anything like that. This comment occurred some time before they actually left the beach. Once Bivert said to defendant, "let's go," the others left.

When they returned to Patton, defendant thought they were only going to talk to him. Although he knew Bivert had obtained additional shells from Ruiz, he thought Bivert had shot all of them. He did not hear Bivert load the shotgun. He denied intending to steal the truck or agreeing with Bivert to steal it. He denied telling Bivert's brother Jeremy that he distracted Patton while Bivert shot him.

After Patton was shot, defendant froze and then exclaimed to Bivert that he "did not believe [he] did that." Bivert started throwing the fishing equipment into the water. Defendant said, "I didn't want no part of it, I didn't shoot him, that I wasn't involved in it." Bivert told defendant that he "was just as guilty as [Bivert] was because I was there and it was my gun. And that, um, it was his word against mine that I didn't do anything, or something like that." After this exchange, defendant said nothing else but began throwing Patton's equipment into the water. He got Patton's truck keys "[b]ecause Kenny told me to get them." Defendant testified that the next day he was scared because of Bivert and because he knew he was in trouble. When asked if he was afraid of anything in particular, defendant responded, "I was afraid he might do it to me." This fear was not based on threats or menaces from Bivert but from witnessing Patton's death.[5]

Defendant failed to report Patton's murder because he was "terrified" from the incident and "was kind of in a black of what happened." Even though he was home with his parents Sunday and Monday, it never occurred to him that they could help him if he confided in them.

### MURDER OF THE ROGERSES

Bivert testified that on Monday night he, defendant and another friend Adrian decided to rob the Bank of America in Knights Landing. Bivert denied threatening defendant at any time. The plan involved stealing a car to

---

[4] Garske testified that defendant told Bivert he would not chicken out but "would go on with it."

[5] Before Patton was shot, defendant felt the same generalized fear of Bivert that he always felt about him. He did not know if Bivert would kill him if he went home with Garske or if he stayed on the beach instead of going to Patton or if he did not rob Patton. After he left Bivert the next morning he just had a general idea that Bivert would kill him, nothing specific. Despite this fear, after Patton's murder, defendant went out into a secluded area shooting with Bivert. He was afraid of Bivert because he has "always been frightened of him."

get away, driving to the airport and flying to Mexico. On Tuesday morning, Bivert took his grandfather Griffin's guns—a .44-caliber magnum and a .38-caliber special—and met defendant at the bus stop. Bivert gave defendant the .38-caliber revolver. Adrian decided not to go. After shooting up all their ammunition and going back to town for more, they walked toward the dam. They saw the Rogerses' car in the distance and decided to steal it. They had decided to steal the car because defendant could not find one without locked steering which he could hot-wire. They first discussed holding the gun on the owner and demanding the keys, then jointly agreed to shoot them. Bivert recalled that the shooting was initially his idea but that defendant agreed. Bivert testified that they asked the Rogerses if they were catching anything, then both began shooting. Bivert saw defendant shoot both Mr. and Mrs. Rogers.

As soon as the Rogerses were dead, Bivert threw their fishing equipment into the water and defendant went through Dawn's purse, taking money and the keys. Defendant then pulled both bodies into the water. They left in the Rogerses' car, drove back to Knight's Landing and got gas. They saw a sheriff in town and decided they were too scared to rob the bank. Bivert testified that he intended to kill both the Rogerses in order to get their car.

### Defendant's Testimony Regarding the Rogerses

According to defendant, he did not agree to rob the Bank of America with Bivert on Monday night. He and Adrian only agreed to give Bivert their decision about participating in the robbery on Tuesday morning at the bus stop. That morning, defendant neither agreed nor refused to go rob the bank with Bivert. He believed their plan was to skip school and go target shooting. In addition to the pistols, Bivert brought a hat. He cut eyeholes out of it at the bus stop and joked about robbing a bank. After getting more ammunition, they returned to the river by the boat dock with two boxes of handgun shells and two boxes of shotgun shells, the .38-caliber special, the .44-caliber magnum and the .12-gauge shotgun. Defendant recalled running into David Williams at the boat dock and talking to him about robbing a bank.[6] They then walked down to the slough. Bivert mentioned that he wanted to get a car that was sitting there to rob the bank. Defendant did not respond. Bivert suggested that they could get the car keys from the people and take it. They were close to the car at this time. Bivert then threatened defendant. "Before

---

[6]David Williams testified that when defendant said he wanted to go home and walked off, Bivert told him to come back or he would blow his head off. Williams was the only witness who testified to hearing Bivert threaten defendant. His testimony was impeached by prior statements. Williams failed to testify to such a threat in previous hearings. A witness testified that Williams said he was going to tell "a big lie" to save defendant. Defendant testified that he did not hear what Bivert allegedly said to him in front of Williams.

we went down there, he said, if he started shooting, that I better start shooting or that he was going to blow my head off, or he was going to do the same to me as he did to the rest, or something to that effect."

Defendant testified that he believed Bivert would kill him if he did not start shooting when Bivert did. Defendant "wondered" whether he would, but the thought that Bivert might not shoot him "passed real quick."[7] They then walked from the car toward the Rogerses. Defendant did not walk away because he was panicked and thought he would be shot in the back; he did not shoot Bivert because he was less experienced with handguns than Bivert; and he did not try to warn the Rogerses due to panic. They walked by the car without checking to see if it could be hot-wired. After they reached the Rogerses and Bivert fired several times, he looked at defendant and said, "you better get to shooting." Defendant then pulled out the .38-caliber revolver, closed his eyes and started shooting. He fired five of his six rounds with his eyes closed. He made no conscious effort to either aim at the Rogerses or away from them.[8]

Defendant did not try to get away from Bivert over the next three days because he was scared. They eventually went to the house of defendant's friend Shane Brumble in Oregon. Defendant told Brumble that they had shot two people in self-defense because he thought Shane would turn them in. Defendant thought it would be better to get caught than for anybody else to be killed or for him to be killed.

Defendant testified that he could not remember Bivert ever threatening him until he was standing on the levee where the Rogerses were fishing. Bivert did not threaten him after shooting Patton. Even though he was afraid of Bivert, he did not know for sure if his death was imminent.

Defendant also testified that right before he pulled the trigger on the Rogerses, he did not know if Bivert would shoot him if he did not shoot or not. He "thought he might."

Defendant told his psychologist Dr. Podboy that he had agreed with Bivert to rob Patton and that this was his frame of mind prior to the shooting of Patton. Podboy testified that the "altered state of consciousness" ("in the

---

[7]Defendant stated, "I just thought he might not because we had been friends. But that passed through my mind . . . quickly. And then I thought back to when he shot that guy the night or two before; then I thought he would."

[8]Dawn Rogers was shot four times. Raymond was shot three times. Both died of head wounds. Forensic testimony indicated that both the Rogerses had been shot with a .38-caliber revolver—Raymond had a .38-caliber revolver wound in the top of his head and Dawn had a .38-caliber revolver wound in her back.

black") described by defendant after Patton's shooting is not unusual following the witnessing of a homicide. Such a state would be equally likely in one who had agreed to rob and kill someone.

The prosecution argued both premeditated murder and felony murder during the commission of the robberies and conspiracy to commit robbery. The jury was instructed on each of these theories and on theories of second degree murder and involuntary manslaughter. Included within the involuntary manslaughter instruction was the charge that an honest but unreasonable belief in the need for self-defense against imminent peril negates malice and the killing is manslaughter.

The jury returned verdicts of guilty on all murder and robbery counts and their special findings. Not guilty verdicts were returned on both counts of grand theft-firearm. Defendant was sentenced to state prison for 52 years to life.[9]

## DISCUSSION

### I. USE OF BIVERT'S PRIOR TESTIMONY*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. DUTY TO INSTRUCT ON HONEST BUT UNREASONABLE BELIEF IN DURESS

■ Even in the absence of a request, "a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial.[] 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1], quoting *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) Such sua sponte duty arises ". . . only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

[9]Defendant was sentenced to 25 years to life on count 1; 25 years to life on count 3; and 2 years for using a firearm in the commission of count 3. The court stayed the upper terms of five years on the three robbery counts (counts 2, 4 and 6); stayed the three remaining firearm-use enhancements; and imposed a concurrent twenty-five years to life term on count 5.

*See footnote 1, *ante*, page 288.

 The defense theory was that defendant was in an altered state of consciousness after Bivert shot Patton and that he participated in taking Patton's property that night and in shooting the Rogerses several days later due to his belief that Bivert would kill him if he did not. Defendant was clearly relying on a theory of duress. Defendant argues that his convictions must be reversed because the trial court failed sua sponte to instruct the jury under *People* v. *Smith* (1986) 187 Cal.App.3d 666 [231 Cal.Rptr. 897], that an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and felony murder based on robbery.[12] We decline to follow *Smith, supra,* because we conclude that it improperly extended the rationale of *People* v. *Flannel, supra,* 25 Cal.3d 668, from malice to specific intent. In so doing, we part company with the Fourth District.

In *People* v. *Smith, supra,* 187 Cal.App.3d 666, defendant was convicted of felony murder during a robbery and kidnapping for the purposes of robbery. Defendant testified that he wanted to leave but that his coconspirator had made threats which made him believe that he would be shot if he did not comply. On appeal, the court agreed with defendant that *Flannel, supra,* "provides support" for imposing a duty on future trial courts sua sponte to instruct "that an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and kidnapping for the purpose of robbery." (*Id.* at p. 679.) The court declined to apply this duty to reverse defendant's convictions due to the absence of precedents providing direct support for imposing such a duty. In a footnote, the court indicated that "[a]s in *Flannel,* we are of the view that the discussion of the issue in this case gives rise to a sua sponte duty in future cases whenever the

---

[12]Without citation to authority or argument, defendant briefly states that an honest but unreasonable belief in duress would negate the premeditation and deliberation necessary to support the prosecution's alternative murder theory. Failure to argue the matter and to cite to authority is deemed a waiver of the point. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].) In his reply brief, defendant for the first time contends incorrect language was used by the court in instructing the jury that an honest but unreasonable belief in duress would negate malice. Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief. (*Kahn* v. *Wilson* (1898) 120 Cal. 643, 644 [53 P. 24].) In any event, where, as here, it appears beyond a reasonable doubt that the jury based its verdicts on a theory of felony murder supported by competent evidence, it is unnecessary to address these issues. (See, e.g., *People* v. *Sanders* (1990) 51 Cal.3d 471, 509-510 [273 Cal.Rptr. 537, 797 P.2d 561].) The prosecution's evidence established that the killings and robberies were part of continuous transactions. The jury having found the defendant guilty of the underlying robberies based upon substantial admissible evidence, there is no reasonable likelihood that it would have based its verdict on a theory other than felony murder. Since the jury was correctly instructed under the felony-murder doctrine, any error in instructions concerning premeditated and deliberate murder could not possibly have affected the jury's verdict so as to result in a miscarriage of justice. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 688 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d at pp. 684-685, fn. 12; *People* v. *Atkins* (1982) 128 Cal.App.3d 564, 569 [180 Cal.Rptr. 440].)

evidence suggests an honest belief, which if reasonable, would absolve the defendant of liability for the charged crime. Under such circumstances, an honest but *unreasonable* belief may negate the appropriate specific intent element." (*Id.* at p. 679, fn. 8; italics in original.)

*Smith* provided no analytical support for its determination that it was appropriate to extend the holding in *Flannel* from malice to specific intent. The two conclusory sentences quoted above were the extent of the discussion of this issue. Nor have subsequent cases amplified its reasoning. No reported decisions have followed *Smith*. It has, however, been criticized "to the extent that it requires use of the unreasonable belief instruction where it would serve to acquit the defendant," rather than to mitigate the charged offense. (*People* v. *McKelvy* (1987) 194 Cal.App.3d 694, 703, fn. 5 [239 Cal.Rptr. 782].)[13]

*Flannel*'s holding that an honest but unreasonable belief in the need to defend can negate malice is inapplicable to specific intent. *Flannel* held there was inherent incompatibility between malice as it defined that term and the honest belief in the need to defend oneself—i.e., that one "cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard."[14] (25 Cal.3d at p. 679.) Here, there is no such incompatibility.

One who acts under an honest but unreasonable belief in duress faces an agonizing choice: the defendant simultaneously genuinely perceives the need to defend himself and understands that he can negate the threat to himself only by performing a specific unlawful act against an innocent third party. To protect himself, the defendant must both specifically intend to perform the unlawful act and act on that specific intent. There is no inconsistency here but a concurrence of act and intent. The existence of intent is not negated by the legal fiction of transferring it to the aggressor. Even in the

---

[13]In *People* v. *McKelvy, supra,* 194 Cal.App.3d 694, the court held that the *Flannel*-type instruction should sua sponte be given to negate the malice required for the general intent crime of mayhem only in the limited situations where there is evidence to support a conviction of lesser included offenses and the jury is instructed on such offenses. The court based this limitation on the purpose of the *Flannel* instruction which it characterized as "to *mitigate* due to the absence of malice, not to absolve the defendant of criminal responsibility—*Flannel* did not take the step of *excusing* an offense due to an unreasonable belief in the need for self defense." (*Id* at p. 703; italics in original.)

[14]Although there was some evidence presented that the Rogerses were killed in self-defense, this theory was never seriously urged by the defense, which focused on duress. Defense counsel did not even argue self-defense in his closing argument. His only reference to this evidence was to dismiss it as "the phoney Bivert story", i.e., that, if caught, they would say that someone pointed a shotgun at them as they were going down the river and that they shot back.

context of self-defense, it has been recognized that "[o]ne could have an honest but unreasonable belief in the necessity of self-defense and still have the specific intent to inflict great bodily injury." (*People* v. *Goins* (1991) 228 Cal.App.3d 511, 517 [279 Cal.Rptr. 42] [rev. den; *Flannel* instruction held inapplicable to a great bodily injury enhancement under § 12022.7].) We conclude that *Smith* inappropriately extended the holding in *Flannel* from the context of the mental state of malice to the distinct mental state of specific intent.

In this case, the jury was instructed with CALJIC Nos. 3.31 and 9.10 that there must be a concurrence of act and specific intent and that the specific intent for robbery was "the specific intent unlawfully to permanently deprive the owner of his property. " Defendant's motive may have been to defend himself. However, by his own testimony defendant intended to permanently deprive the Rogerses of their property by participating in the robbery in order to achieve that end. There was no error.

III.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Blease, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 19, 1992.

---

*See footnote 1, *ante*, page 288.