Filed 7/15/13  P. v. Flores CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B237696 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA373684) |
| v. | |
| JULIO MANUEL FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald H. Rose, Judge.  Affirmed with directions.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Julio Manuel Flores appeals from the judgment entered upon his jury conviction of second degree murder and attempted murder. He argues substantial evidence does not support his attempted murder conviction, the "kill zone" jury instruction, and the true findings on the gang allegation. He also argues the court committed reversible error when it limited the investigating officer's cross-examination about withholding evidence, admitted hearsay evidence, and did not instruct on simple assault and assault by means of force likely to cause great bodily injury as lesser included offenses of murder and attempted murder. In addition, defendant complains of judicial bias.

We find no ground for reversal and affirm the judgment. We direct the trial court to correct the pertinent minute order and the abstract of judgment to reflect that the attempted murder conviction was not based on a finding of willfulness, premeditation, and deliberation.

**FACTUAL AND PROCEDURAL SUMMARY**

At about 9:15 p.m. on July 15, 2010, Yesenia Chavez arrived at her family's home at 3719 South Mettler Street in Los Angeles. She lived at that address with her parents, siblings, and other relatives. Yesenia unlocked the sliding gate across the driveway, parked her car, gathered her belongings, and walked back to close the gate. She saw defendant on the other side of the gate. He shouted three times, "This is 36th gang," and made a gang hand sign. No one in Yesenia's household was associated with a gang, but their house was just outside the territory of the 36th Street gang.

Yesenia's boyfriend, Rafael De Paz, who also was at the house, went out to help Yesenia close the gate. De Paz heard defendant yell he was from the 36th Street gang and saw him throw gang hand signs. After De Paz partially closed the gate, defendant shook it with both hands. Yesenia's father, Vicente Chavez, stepped out on the porch and asked, "What do you want?" or "What happened?" He was barefoot and barehanded. Defendant pulled out a gun and fired three to four shots. At the time of the shooting, Yesenia was near the porch. De Paz, who was still at the gate, ran past her to the back of

2

the driveway. Vicente died of a gunshot wound to the head. Yesenia was shot in the chest. Defendant rode away on his bicycle.

Yesenia's brother described the suspect to police. Later that night, an officer patrolling the area of 37th Street and Maple Avenue, four blocks west of the Chavez house and within gang territory, saw defendant, who matched the description of the suspect. Defendant was riding a bicycle and tried to pedal away when he saw the officer. On being ordered to stop, he dropped the bicycle and ran. He also pulled what appeared to be a gun from his waistband and tossed it into a yard, but no gun was found in the subsequent search of the area.

Defendant was arrested after a field show-up before Yesenia's brother. Gunshot residue swabs were taken for testing from defendant's hands and shirt. Defendant was transported to jail, where his telephone calls on July 16, 2010 were recorded. Excerpts from the recorded phone calls were played for the jury. Yesenia, her younger sister, and De Paz identified defendant in a photographic line-up and at trial. A cell phone was found in the middle of the street in front of the Chavez house. No data was recoverable from it, but in his recorded phone calls from jail, defendant repeatedly stated he was caught because he had lost his phone and had gone out to look for it.

Defendant was charged with murder (Pen. Code, § 187, subd. (a)),[1] with an allegation that he personally discharged a handgun causing death (§ 12022.53, subd. (d)), and attempted premeditated murder (§§ 664; 187, subd. (a)). As to both counts, it was alleged defendant personally used and intentionally discharged a firearm during the commission of the crimes. (§ 12022.53, subd. (b) & (c).) A gang enhancement also was alleged. (§ 186.22, subd. (b)(1)(C).)

The case was tried to a jury, which found defendant guilty of second degree murder and attempted murder. It found all special allegations to be true, except the allegation that the attempted murder was willful, deliberate, and premeditated. On count 1, defendant was sentenced to 15 years to life in prison, plus 25 years to life on the

---

[1] All statutory references are to the Penal Code, unless otherwise noted.

firearm enhancement under section 12022.53, subdivision (d), and 10 years on the gang allegation. On count 2, he was sentenced to 9 years, plus one-third of 20 years on the gun enhancement under section 12022.53, subdivision (c), and one-third of 10 years on the gang enhancement. The sentence on the remaining firearm enhancements was stayed.

This timely appeal followed.

## DISCUSSION

### I

Defendant challenges the sufficiency of the evidence with regard to the attempted murder conviction and the true gang enhancement finding. On appeal, we view the evidence in the light most favorable to the judgment and draw all reasonable inferences in its support. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This standard also applies to the sufficiency of the evidence challenge to an enhancement. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

*A. Attempted Murder*

The jury found the allegation that the attempted murder of Yesenia was committed willfully, deliberately, and with premeditation to be "not true." Although the verdict was correctly read into the record, the finding was incorrectly recorded as "true" in the minute order. The abstract of judgment, also incorrectly, reports the conviction on count 2 as "attemptd [*sic*], willful murder." Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–186.) We shall order the clerical errors in the minute order and abstract of judgment corrected. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 386.)[2]

---

[2] On the incorrect assumption that defendant was convicted of first degree attempted murder, his appellate counsel argues at length that there was no evidence of deliberation and premeditation. We do not address this argument.

4

Defendant challenges the sufficiency of the evidence for the "intent to kill" element of attempted murder and the "kill zone" instruction on count 2. We conclude that the jury instruction and conviction on count 2 are supported by substantial evidence.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.) Firing a gun toward a victim at close range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." (*Id.* at p. 945; *People v. Smith* (2005) 37 Cal.4th 733, 741.) A concurrent intent to kill exists "where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (*Id.* at pp. 745–746, 755.)

The jury was instructed with a modified version of CALCRIM 600.[3] In relevant part, the instruction read: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order

---

[3] The "kill zone" portion of CALCRIM 600 reads as follows: "[A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, the People must prove that the defendant not only intended to kill <insert name of primary target alleged> but also either intended to kill <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory> or intended to kill <insert name or description of primary target alleged> by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>.]"

5

to convict the defendant of the attempted murder of Yesenia Chavez, the People must prove that the defendant not only intended to kill Vicente Chavez but also either intended to kill Yesenia Chavez, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Yesenia Chavez or intended to kill Vicente Chavez by killing everyone within the kill zone, then you must find the defendant not guilty of the attempted murder of Yesenia Chavez."  Defense counsel objected to this instruction.

The kill zone instruction was supported by substantial evidence, and so was the jury's finding of attempted murder as to Yesenia, either on that theory or on the theory that he harbored a separate intent to kill Yesenia.  Defendant shot several bullets at close range (15 to 35 feet) and in the general direction of both Yesenia and her father, Vicente.  Vicente was on the porch steps.  Yesenia was near the porch when the shooting started, and she ran up the porch steps during the shooting.  She saw defendant point something at her, her house, and her father.

Defendant suggests the "kill zone" theory does not apply because he did not use a bomb or an automatic weapon.  Although an explosive device and automatic weapon fire have been used to illustrate the kill zone theory (see *People v. Bland* (2002) 28 Cal.4th 313, 330), they are not the exclusive means of creating a zone of danger.  "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim."  (*People v. Smith*, *supra*, 37 Cal.4th at pp. 746–747.)  That defendant shot several bullets in rapid succession in Vicente's general direction was sufficient to create a zone of harm.  The fact that he either failed to kill everyone or abandoned his effort does not negate the intent to kill.  (See *People v. Lashley*, *supra*, 1 Cal.App.4th at p. 945.)

The kill zone instruction and attempted murder conviction on that theory are supported by substantial evidence.

6

## B. Gang Allegation

Defendant challenges the true finding on the gang allegation on the ground that he was a member of the Maple Street Locos, a subset of the 36th Street gang, and there was no evidence that subsets of the larger gang collaborated or were part of an organizational structure, or that the Maple Street Locos separately qualified as a criminal street gang.

The gang enhancement in section 186.22, subdivision (b)(1) applies to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang . . . ." Section 186.22, subdivision (f) defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the [enumerated] criminal acts . . . having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

Defendant relies on *People v. Williams* (2008) 167 Cal.App.4th 983. In that case, a member of a group called "the Small Town Peckerwoods" was convicted of murder and active participation in a criminal street gang. (*Id*. at p. 985.) The gang expert testified the Small Town Peckerwoods is a faction of the Peckerwoods, a gang that espouses white supremacist ideology. (*Id*. at p. 988.) The appellate court reversed the gang-related enhancement and conviction because the expert's conclusion "appear[ed] to have been based on commonality of name and ideology, rather than concerted activity or organizational structure." The court was concerned that the jury may have found the Small Town Peckerwoods was a criminal street gang based on evidence related to "some larger Peckerwood organization." (*Id*. at p. 985.) It explained that "having a similar name is [not], of itself, sufficient to permit the status or deeds of the larger group to be ascribed to the smaller group." (*Id*. at p. 987.)

The peculiar facts of *People v. Williams* make it readily distinguishable. The defendant in that case claimed "there was no evidence he was an active member in any group other than the Small Town Peckerwoods." (*People v. Williams*, *supra*, 167 Cal.App.4th at p. 987.) The only evidence that he belonged to a larger organization was a

"Peckerwood" tattoo. (*Id*. at p. 988.) The court was reluctant to rely on that name as evidence of more than shared ideology because of its "racial connotation in everyday parlance." (*Id*. at p. 989.)

None of the peculiar issues that concerned the court in *People v. Williams* is present in this case. The gang expert testified defendant had tattoos that indicated his membership in the 36th Street gang, as well as the Maple Street Locos. He explained that the Maple Street Locos is a geographical subset of the larger gang. The names of the larger organization and its subset are street-related and have no other invidious connotations. The expert explained that Hispanic gangs in Southern California are "turf based gangs" that develop and control their territory. The fact that the Maple Street Locos shares common territory with the 36th Street gang is evidence of common organization that was missing in *People v. Williams*. The gang expert also testified the larger gang has common hand signs, symbols, and tattoos, as well as common rivals, with which it fights over territory.

Unlike the defendant in *People v. Williams*, defendant readily admitted his active membership in the larger gang to police and testified about it at trial in this case. He announced the name of the 36th Street gang at the time of the shooting. Considering his repeated self-identification with that gang, defendant cannot fairly rely on *People v. Williams* to argue there was no evidence of his collaboration with the larger gang or that there should have been evidence the Maple Street Locos separately qualified as a criminal street gang. His self-identification during the shooting supports the inference he was acting for the benefit of the 36th Street gang rather than the Maple Street Locos. (See e.g., *People v. Mendez* (2010) 188 Cal.App.4th 47, 59 [crime benefited gang whose name defendant announced during its commission].)

The gang enhancement is supported by substantial evidence.

## II

Defendant challenges two evidentiary rulings. His first argument is that the court violated his right to due process, to confrontation, and to present a defense when it limited the questioning of the investigating officer, Detective Benavides, about

8

withholding exonerating evidence. The second is that the court violated his right to due process, a jury trial, and confrontation in allowing the prosecution to introduce hearsay statements included in the transcript of his recorded telephone calls from jail, made on the day after his arrest.

### A. *Limitation of Witness Examination*

The defense was made aware that defendant's T-shirt had been sent for gunshot residue analysis, but testing could not be performed on it. Detective Benavides's trial testimony that defendant's hands had been swabbed for gunshot residue at the time of his arrest came as a surprise to both the prosecution and the defense. The swabs had been tested, and the gunshot residue kit returned negative results. The criminologist who analyzed the results finalized his report in October 2010 (nine months before trial) and at some point turned it over to the investigating officers. In the report, he stated he could not reach a conclusion whether defendant had been in contact with a gun. At the request of defense counsel, the court appointed a defense gunshot residue expert. After extensively cross-examining the criminologist, the defense declined to call the expert the court had appointed.

Defense counsel sought to question Detective Benavides about failing to turn over the criminologist's report. The prosecutor objected that the absence of the one-page report from his copy of the murder book prepared by the police was an inadvertent oversight. The court concluded that the criminologist's report was not exculpatory evidence, the defense was not prejudiced since it was allowed to consult with its own expert, and defense counsel's line of questioning was unduly time consuming and of little probative value under Evidence Code section 352.

Evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) A decision to exclude evidence under Evidence Code section 352 will not be reversed absent an abuse of discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

9

Defendant takes issue with the court's conclusion that the criminologist's report was not exculpatory. Under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), the prosecution has a duty to disclose evidence that is favorable to the accused. (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1471.) The duty extends to evidence the prosecution team—including the police investigators—possesses. (*People v. Superior Court (Barrett )* (2000) 80 Cal.App.4th 1305, 1314.) Assuming the negative gunshot residue result was favorable to defendant, a *Brady* violation occurs only when the prosecution's suppression of evidence favorable to the defense causes prejudice. (*People v. Uribe, supra,* at p. 1474.) Defendant does not argue that a *Brady* violation occurred in this case. Nor would such an argument succeed since the criminologist's report was disclosed during trial and the defense was allowed to make full use of it. (See *People v. Garcia* (2000) 84 Cal.App.4th 316, 330–331; *People v. Sanchez* (1998) 62 Cal.App.4th 460, 474, fn. 8.)

Defendant next argues that the jury was entitled to consider the late disclosure of evidence in evaluating its credibility and weight. Section 1054.5, subdivision (b) provides that the "court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." The court may do so by instructing the jury with CALJIC No. 2.28.[4] But defense counsel did not request that the trial court instruct the jury regarding the delayed disclosure of the criminologist's report, so as to allow it to consider that fact in determining the weight of the report. Nor does defendant argue that the jury should have been so instructed. Instead, defense counsel referenced the jury instruction as justification for impeaching Detective Benavides with the delayed disclosure of the report. The prosecutor correctly pointed out that CALJIC No. 2.28 had nothing to do with the detective's credibility.

---

[4] CALJIC No. 2.28 provides: "[If you find that the [concealment] [and] [or] [delayed disclosure] was by the prosecution, and relates to a fact of importance rather than something trivial, and does not relate to subject matter already established by other credible evidence, you may consider that [concealment] [and] [or] [delayed disclosure] in determining the [[believability] [or] [weight] to be given to that particular evidence[.]] [[, or] [ ].]]"

10

Defendant in essence argues that he had a constitutional right to impeach the detective's credibility by questioning him about the delayed disclosure of the criminologist's report. The rules of evidence do not "impermissibly infringe" on the right to present a defense. (*People v. Robinson* (2005) 37 Cal.4th 592, 626.) Similarly, the Confrontation Clause of the Sixth Amendment does not prevent the court from imposing "reasonable limits" on cross-examination that is only marginally relevant or confusing the issues. (*People v. Cooper* (1991) 53 Cal.3d 771, 817.) To state a constitutional violation, a defendant must show that "'the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness's] credibility . . . ."'" [Citations.]" (*Ibid.*) Defendant does not make that showing.

There is no basis to conclude that Detective Benavides would have testified that the omission of the criminologist's report from the murder book was intentional. On the witness stand, the detective readily acknowledged that defendant's hands had been swabbed and the swabs tested for gunshot residue. His straightforward answers do not suggest that he was involved in any intentional cover-up of the results of the test. Defendant argues that, even were the detective to testify the omission was inadvertent, the jury could still find him not credible "in light of all the other evidence. " But he does not point to any other evidence impeaching the detective's credibility. The record shows there were several investigating officers, and it is unclear whether the detective prepared the murder book.

*Crane v. Kentucky* (1986) 476 U.S. 683, on which defendant primarily relies, is inapposite. There, the trial court excluded testimony seeking to establish the involuntariness of the 16-year-old defendant's confession, on which the case was primarily based. (*Id.* at pp. 690–691.) The conviction was reversed because there was no "rational justification for the wholesale exclusion of this body of potentially exculpatory evidence . . . ." (*Id.* at p. 691.) In contrast, the trial court here reasonably concluded the delayed disclosure did not prejudice defendant, and questioning the detective about it would be of little probative value and unduly time consuming. Defense counsel said he only wanted to ask the detective when he turned over the report to the prosecutor. But

11

that issue could not have been resolved fairly with a single question. We find no abuse of discretion in the court's ruling.

Nor can defendant establish prejudice. "'[I]mpeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime" [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citations].'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1050.) In the opening brief, defendant vaguely suggests that questioning Detective Benavides about the delay in turning over the criminologist's report would have called into question the eyewitnesses' identification of defendant. Only in the reply brief does he articulate the gist of this argument: that impeaching Detective Benavides about the delayed disclosure of the criminologist's report also would have discredited the photographic line-up identifications the detective administered to witnesses who identified defendant as the shooter, because it "would have raised questions as to the reliability and integrity of the identification techniques employed" at the line-ups. This argument comes too late, depriving the People of an opportunity to rebut it. (*People v. King* (1991) 1 Cal.App.4th 288, 297, fn. 12.) It also is largely conclusory since defendant fails to identify the detective's techniques, or the questions that could have been raised about their reliability or integrity. (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6 [contentions set forth in conclusory fashion are forfeited].)

The record indicates that the detective was extensively questioned about the investigation and the photographic line-up, which was recorded. The witnesses also were questioned about their identification of defendant at the line-up. Defendant has raised no questions about the validity of the witnesses' identification either at the line-up or at trial. The argument that impeaching the detective's credibility about the delayed disclosure of one item of evidence would have changed the result in defendant's favor is entirely speculative.

## B. Hearsay Evidence

Excerpts from defendant's recorded telephone calls from jail on the day after the

12

shooting were played at trial.[5]  Defense counsel made hearsay objections to four statements in those excerpts.  The court ruled the statements were not offered for their truth, but to show defendant's state of mind at the time he made the calls and to provide context for the rest of the calls.  The objected-to statements were highlighted in yellow on the transcript, and the jury was admonished that these statements were not admitted for their truth but to provide context.

In one telephone call, defendant stated, "They got, they got four witnesses," then added, "They're like, 'Yeah, that's him.'"  The person on the other end of the line advised defendant to "[t]ell them . . . it wasn't your ass."  To this, defendant responded, "I told them, fool, but those fools really saw me, fool."  He repeated that "the witnesses . . . they are pointing me out."  Defense counsel objected only to defendant's statement, "They're like, 'Yeah, that's him.'"

Counsel also objected to defendant's statement, made during a different telephone call, that, after he was arrested, "the witnesses like, nah, it's him, that's him, right there . . . ."  The court asked whether this was in reference to the field show-up before Yesenia's brother, who did not testify, and the prosecutor responded that was the only field show-up of which the prosecution was aware.

Another statement to which defense counsel objected was made in the context of defendant's recounting that the officers flashed lights at his face during his arrest, and that "I just heard the [cop] was like, yeah, yeah she said, that's him.  So I'm pretty sure it's the female . . . ."  Counsel objected to the statement "yeah, yeah she said, that's him."

The other person on one of the calls said that "they . . . came to my house, . . . [¶] then that fool, like, negative, negative, negative."  Counsel objected to this as a hearsay reference to other field identifications.  Counsel did not object to defendant's response, "Nah, fool, when they saw me, . . . they were like yeah, that's him."

---

[5] Both Spanish and English were spoken during the phone calls, as reflected in the left column of the transcript provided to the jury.  The right column includes in italics the English translation of Spanish passages.  We quote from the English translation, which the jury was told to follow.

13

"Evidence of an out-of-court statement is . . . admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute. [Citations.] For example, an out-of-court statement is admissible if offered solely to give context to other admissible hearsay statements. [Citation.]" (*People v. Davis* (2005) 36 Cal.4th 510, 535–536.) The Confrontation Clause is not implicated when evidence is admitted for a nonhearsay purpose. (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6, citing *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9.)

Defendant argues the objected-to hearsay statements could not have been used to give context for other statements relevant to any issue in dispute, since the telephone calls indicated only that defendant was frustrated that witnesses had identified him as the shooter at a field show-up. Defendant testified he believed he had been identified by witnesses sitting in a police car at the time of his arrest because a light was flashed at him, and he overheard the arresting officers say something defendant interpreted to mean he had been identified. The investigating officer testified to a field show-up only before Yesenia's brother. Thus, defendant's insistence in the telephone conversations that multiple witnesses had said, "Yeah, that's him," appears to have been a dramatic expression of his belief that he had been identified rather than a hearsay statement actually made by any identifying witness. Additionally, while at trial defendant insisted his statements that the witnesses had seen him referred to what he believed had occurred at the time of his arrest, the jury was free to infer defendant was concerned because he had been seen at the time of the shooting.

That the recorded phone calls were not offered for the truth of any hearsay field identification also is clear because Yesenia, her younger sister, and De Paz identified defendant in court. Any additional identification evidence would simply have been cumulative. Rather, the telephone calls were separately relevant because they demonstrated defendant's consciousness of guilt. In addition to insisting that the witnesses had seen him, defendant told his niece: "Uncle did a bad thing and now, he's in jail." When he was asked during one telephone call, "that fool got hit or what?,"

14

defendant responded, "I don't know, fool, everything happened quick. . . ." When in another call it was suggested to defendant that he "should have stashed" himself, defendant responded, "I was, fool, I was already, fool. . . . I went back to look for my . . . phone, fool, and I got caught slipping . . . ."

In light of the many such self-incriminating statements, defendant cannot establish he was prejudiced because the court directed that the four challenged statements be highlighted on the transcript. The court did this to identify which statements the jury should not consider for their truth; any method the court might have used would have directed the jury's attention to those statements. We are satisfied the objected-to statements were not offered for their truth, and the jury is presumed to have followed the court's instruction to that effect. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Nor can defendant establish he was prejudiced by the admission of the four statements to which defense counsel objected. The jury could infer defendant's guilt from other statements he made during the recorded telephone calls. Moreover, three eyewitnesses identified defendant in court. As we noted, defendant does not directly challenge those in-court identifications. Thus, any error associated with the admission of the objected-to statements was harmless under either the California reasonable probability test or the federal beyond a reasonable doubt test. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

III

Defendant argues the trial judge was biased against him. Outside the presence of the jury, during a recess in the middle of defendant's cross-examination about the transcript of the recorded phone calls, the court stated, "I'm sure the People have some questions in regards to page nine that may take some time." Defense counsel objected to the court directing "the People to a page in the transcript," which he thought everyone would agree was incriminating. Counsel also complained that the court had asked "numerous questions" that he believed "clarified the People's position." Counsel conceded he had not objected to any of the court's questions.

15

Defendant argues the record reflects "the appearance of favoritism" towards the prosecution. "'[J]udges presiding at trials should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.]" (*People v. Burnett* (1993) 12 Cal.App.4th 469, 475.) The court's remark about page nine, even assuming it directed the prosecutor to a page in the transcript of the recorded phone calls that contained information favorable to the People, was made outside the presence of the jury.

Defendant also contends the court repeatedly intervened in the case on the prosecutor's behalf. To illustrate this point, he cites to pages in the reporter's transcript, all of which precede the exchange outside the jury's presence during which defense counsel first brought his concern to the court's attention. A timely objection is generally necessary to preserve a claim of judicial misconduct for appellate review, unless the objection would have been futile. (*People v. Cash* (2002) 28 Cal.4th 703, 730.) Defendant's trial counsel conceded he had not objected to any of the court's questions, and defendant's list of page numbers by itself does not indicate any impropriety.

That the court frequently participated in the examination of witnesses is insufficient to establish judicial misconduct since "[a] trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597.) Defendant did not point to any place in the record where the court's intervention in the examination of witnesses reveals any other purpose. Specifically, he cites to the court's brief questions regarding a document used to refresh an officer's testimony, the photograph of the street in front of the Chavez house, the criminologist's experience with gunshot residue analysis, and statutory references to predicate crimes. His concern appears to be that the court's questioning clarified certain points in the prosecution's case to the jury. But seeking to clarify these points was in itself neither improper nor prejudicial to the defense.

Defendant argues the court's decision to highlight the four challenged statements in the transcript of the recorded phone calls "exacerbated" the appearance of bias. As we

16

have explained, as a result of defense counsel's hearsay objection, the court had to identify for the jury the portions of the transcript subject to a limiting instruction. Any method of doing so would have drawn the jurors' attention to the objected-to statements. We see nothing inherently improper in the method the court selected.

Defendant's examples do not establish an appearance of judicial bias.

IV

According to defendant, the court had a duty to instruct on assault and assault by means of force likely to cause great bodily injury as lesser included offenses of murder and attempted murder. Under the "elements test," a crime qualifies as a lesser included offense "if the statutory elements of the greater offense include all the elements of the lesser offense so that the greater offense cannot be committed without committing the lesser offense. [Citation.]" (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.) Alternatively, under the "accusatory pleading test," a crime qualifies as a lesser included offense "if 'the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater [offense] cannot be committed without also committing the lesser [offense].' [Citation.]" (*Ibid.*) Whether the trial court erred in failing to instruct on a lesser included offense is reviewed de novo. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 739.)

Defendant's argument is premised solely on the "elements test." Defendant acknowledges that, since violence is not an element of murder, assault is not a lesser included offense of murder under this test. (See *People v. Cook*, *supra*, 91 Cal.App.4th at pp. 918–919.) He also acknowledges that, in *People v. Benjamin* (1975) 52 Cal.App.3d 63, 71, the court held that "murder can be committed without committing an assault . . . by means of force likely to produce great bodily injury. For example, one could commit a murder by withholding food and drink from an invalid."

Defendant argues that, "while the act of 'withholding food and drink . . .' is by itself a nonviolent act," the symptoms of dying from dehydration could be "characterized as 'force' or 'violence.'" He cites no authority for this proposition, other than a footnote in a partial dissent in an out-of-state case affirming the right of a patient to refuse life-

17

sustaining treatment. (See *Brophy v. New England Sinai Hosp., Inc.* (1986) 497 N.E.2d 626, 641, fn. 2 (Lynch, J., dissenting in part).) The footnote lists the various symptoms of dying from starvation and dehydration and ends with the observation that the patient's "attending physician described death by dehydration as cruel and violent." (*Ibid.*)

Defendant's argument begs the question why an act's discrete effects on bodily functions, rather than the act itself, should determine the elements of a crime. We are not persuaded that the footnote on which he relies, which described only the effects on the body from dehydration and starvation, has any bearing on the issue of how a murder can be committed. As defendant acknowledges, cases are not authority for propositions not considered. (See *People v. Barragan* (2004) 32 Cal.4th 236, 243.)

Additionally, the duty to instruct on a lesser included offense does not arise unless substantial evidence supports a conclusion that the defendant is guilty only of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Defendant argues that "the spontaneous nature of the shooting" raised doubt about the malice and intent to kill elements of murder and attempted murder respectively. As we explained, firing a gun at close range is sufficient to infer an intent to kill. (See *People v. Lashley*, *supra*, 1 Cal.App.4th at p. 945.) There is no evidence the offenses committed were less than murder and attempted murder, and no instructional error occurred.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the July 15, 2011 minute order and the abstract of judgment to reflect that on count 2 defendant was convicted of attempted murder with a "not true" finding as to willfulness, premeditation, and deliberation.  The clerk is directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                            EPSTEIN, P. J.

We concur:



        MANELLA, J.



        SUZUKAWA, J.


19