Filed 2/26/14  P. v. Harris CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B241038 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA086936) |
| v. | |
| TEVIN HARRIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Tevin Harris, appeals his conviction for first degree murder and robbery, with firearm use and criminal street gang enhancements (Pen. Code, §§ 187, 190.2, subd. (a)(17), 12022.53, 186.22, subd. (b)).[1] He was sentenced to state prison for a term of 50 years to life.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On April 4, 2009, Brian Lee and Garrett Norris went to Orizaba Park to play basketball. Norris placed his iPhone by the pole holding up the backboard. Nine-year-old Aaron was playing in pick-up games at the court along with his brother Francisco and their friends Jose and Asaf. They played with Norris and Lee for a while, and then sat courtside watching others play. Asaf and Jose saw two African American men standing near the basketball court. Hearing one of them say, "Hey, man," or "Hey, you," Asaf approached the men and asked, "Can I help you?" One of them replied, "Stay the fuck out of my business." Francisco asked if the men were going to play, but they said they would just watch.

The men then approached the backboard pole. Aaron saw them whispering to each other and then one of them started walking away. Ten seconds later, the other man picked up Norris's cell phone and started walking toward a nearby alley. Jose also saw one of the men leave first and the remaining man then reach down and grab a cell phone from the base of the backboard pole. Asaf, too, had seen the two men whispering together before the phone was taken. Someone yelled out that a phone had just been stolen. By this time, the two African American men were both headed toward the alley. The witnesses saw them go into the alley.

---

[1]     All further references are to the Penal Code unless otherwise specified.

After running toward the backboard pole and confirming that his phone had been taken, Norris ran after the two men. Lee and the boys also started running after the men. When he reached the alley, Lee saw one of the men point a gun at Norris and shoot him. Norris walked a few steps before collapsing. Lee, who was in medical school, saw that Norris had been shot in the chest and began performing CPR on him.

Norris had sustained a non-fatal gunshot wound to the abdomen and a fatal gunshot wound to the neck. According to the witnesses, defendant Harris was the man who grabbed the phone and his companion was the one who shot Norris.

Harris's mother, Martha Green, told Detective Mark McGuire she had spoken to Harris about the incident and that he had given her the following account. He had been walking by himself near the park when he saw some people playing basketball, so he headed in their direction. He spotted an iPod on the ground, picked it up and started running away. He looked behind him and saw that he was being chased. Then he heard gunshots and he thought people were shooting at him. He kept going.

At trial, Green denied having spoken to Harris about the incident and testified she was drunk when she talked to Detective McGuire. Green acknowledged it was her voice on a recording of the conversation with McGuire, but she denied having ever said Harris was at the park that day or involved in a theft.

A gang expert testified Harris was a member of the Baby Insane gang, a subset of the Insane Crips. The gang's primary activities included robbery and murder. Robbery of cell phones was common. Orizaba Park was in Baby Insane territory.

2. *Defense evidence.*

Davion Davis testified he was a member of the Baby Insane gang and he knew Harris, but he denied that Harris was in the gang. Davis testified he had been at Orizaba Park on the day of the shooting and that Harris was not the man who had run from the basketball courts while holding a gun. That person was T-Bam, another Baby Insane gang member.

3

**CONTENTIONS**

1.  There was insufficient evidence to support Harris's convictions.

2.  The trial court erred by not instructing the jury sua sponte on the crime of attempted robbery.

3.  The trial court erred by not instructing the jury on second degree murder and involuntary manslaughter.

4.  There was cumulative error.

5.  Both Harris's conviction for first degree felony murder and his sentence violated the Eighth Amendment's prohibition of cruel and unusual punishment.

**DISCUSSION**

1. *Sufficient evidence to sustain the convictions.*

Harris contends there was insufficient evidence to support his convictions for robbery and first degree murder.  This claim is meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the

4

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The reviewing court is to presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.) Even if the reviewing court believes the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the trier of fact's verdict. (*People v. Towler* (1982) 31 Cal.3d 105, 118.) It does not matter that contrary inferences could have been reasonably derived from the evidence. As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) It is true "that in general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

"The taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot. [Citation.] Thus, in determining the duration of a robbery's commission we must necessarily focus on the duration of the final element of the robbery, asportation. [¶] Although, for purposes of establishing guilt, the asportation requirement is initially *satisfied* by evidence of slight movement [citation], asportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety." (*People v. Cooper, supra,* 53 Cal.3d at p. 1165, fn. omitted.) That is why a "*mere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot*. [Citations.] In order to support a robbery conviction, the taking, either the gaining possession or the carrying away, must be accomplished by force or fear." (*Id.* at p. 1165, fn. 8, italics added.)[2]

---

[2] The classic example of theft turning into robbery occurred in *People v. Estes* (1983) 147 Cal.App.3d 23, where a Sears security guard watched the defendant take clothes off a rack, put them on and then walk out of the store. The guard confronted defendant outside the store. When defendant refused to return to the store with the guard and started to walk away, the guard tried to detain him. As he did so, defendant pulled out a knife, swung it at the guard and threatened to kill him; the unarmed guard went back to the store for help. Rejecting an argument the merchandise had not been taken from the security guard's immediate presence, the court held: "The evidence establishes that appellant forcibly resisted the security guard's efforts to retake the property and used that force to remove the items from the guard's immediate presence. By preventing the guard from regaining control over the merchandise, defendant is held to have taken the property as if the guard had actual possession of the goods in the first instance. [Citation.]" (*Id.* at p. 27.) *Estes* rejected an argument defendant's assaultive behavior had to be contemporaneous with his taking the merchandise from the store: "The crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety. It is sufficient to support the conviction that appellant used force to prevent the guard from retaking the property and to facilitate his escape." (*Id.* at p. 28.)

"Under the felony-murder rule, a murder 'committed in the perpetration of, or attempt to perpetrate' one of several enumerated felonies, including robbery, is first degree murder. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) " '[A] killing is committed in the perpetration of an enumerated felony if the killing and the felony "are parts of one continuous transaction." ' [Citation.] Indeed, we have invoked the continuous-transaction doctrine not only to aggravate a killer's culpability, but also to make complicit a nonkiller, where the felony and the homicide are parts of one continuous transaction. [Citations.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 207.) " 'A defendant need not do the killing himself . . . to be guilty of murder. He may be vicariously responsible under the rules defining principals and criminal conspiracies. *All persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design.*' [Citation.]" (*People v. Pulido* (1997) 15 Cal.4th 713, 721, italics added.)

        b. *Discussion*.

The prosecution theory was that Harris and his accomplice formulated a plan to steal Norris's iPhone, a theft that became a robbery when Norris was shot. Harris grabbed the phone, he and his accomplice ran into the alley, Norris pursued them and Harris's accomplice shot Norris. The defense theory was that the eyewitnesses mistakenly identified Harris, who had not even been at the park when the incident occurred.

Harris argues the prosecution proved nothing more than a theft because there was no evidence Harris and his companion planned to steal the phone and use violence to prevent Norris from reclaiming it. The essence of Harris's claim is that, because there was no *direct evidence* the perpetrators had a plan to commit robbery, the prosecution could never prove Harris was guilty of robbery felony murder. But this argument ignores the ample circumstantial evidence showing this is what Harris and his accomplice intended.

7

Although no single eyewitness saw everything that happened, in combination the eyewitness testimony established the following. Harris and his accomplice were whispering together just before Harris took the cell phone. The accomplice left first, and Harris followed him after grabbing the phone. Harris and his accomplice ran into the alley. When Norris ran into the alley, in an attempt to retrieve his phone, Harris's accomplice shot him. It was a reasonable inference from the circumstantial evidence that Harris and his accomplice planned to take the phone and defend their theft by violent means if necessary. Harris argues: "For all this Court knows, defendant whispered that he was thinking about taking the phone and the other male should leave so as not to become involved. Alternatively, he could have said he was going to steal the phone but he was not going to use any force or fear because he did not want to be subject to a robbery prosecution." But what matters are the conclusions reasonably drawn from the evidence by the jury, not what conclusions this court might draw. The jury could have reasonably concluded the best explanation for what occurred is that the perpetrators planned to steal the phone and defend their theft with the gun if necessary. Certainly this inference is "no more inherently speculative" than the inferences suggested by Harris. (See *People v. Rodriguez, supra,* 20 Cal.4th at p. 12.)

There was sufficient evidence to sustain Harris's convictions.[3]

2. *Failure to instruct on attempted robbery.*

Harris contends his felony murder conviction must be reversed because the trial court failed to instruct the jury, sua sponte, on the elements of attempted robbery. This claim is meritless.

Harris complains the jury was instructed a killing in the commission of an attempted robbery constitutes first degree felony murder, and the prosecutor expressly argued this theory to the jury during closing argument, but the trial court never defined

---

[3] This conclusion also serves as a rejection of Harris's claim there was insufficient evidence to sustain the true finding on the section 12022.53 firearm enhancement allegation.

8

the elements of attempted robbery. He argues this was prejudicial because "[t]here is no robbery requirement of a specific intent to use force or fear," and "it is unknown on which theory the jury actually relied . . . in convicting defendant of felony murder – attempted robbery or robbery." Harris argues this error stemmed from the trial court's jury instruction that first degree felony murder would be committed "[i]f a human being is killed by any one of several persons engaged in the . . . attempted commission of the crime of robbery." (Ellipsis in original.)

In fact, the trial court said: "If a human being is killed by any one of several persons engaged *in the commission or attempted commission* of the crime of robbery . . . ." (Italics added.) Just before that, the trial court had instructed: "Every person who unlawfully kills a human being during the commission *of a robbery* is guilty of the crime of murder in violation of Penal Code section 187." (Italics added.) The trial court went on to define the elements of robbery felony murder, referring to a homicide "during the commission of the crime of robbery," and noting that "[t]he specific intent to commit robbery and the commission of that crime must be proved beyond a reasonable doubt." The trial court instructed that "the commission of the crime of robbery is not confined to a fixed place or a limited period of time," and "[a] robbery is complete when the perpetrator has alluded [*sic*] any pursuers [and] reached a place of temporary safety." Apart from the single instance identified by Harris, the trial court consistently referred to the underlying felony as "robbery," not "attempted robbery."

Harris complains that, "[r]elying on this instruction, the prosecutor told the jury that defendant could be found guilty of first degree felony-murder based on attempted robbery." But what the prosecutor told the jury was this: "There are two ways to get to first degree murder. One is willful, deliberate and premeditated. . . . [W]hat we have here is the second rung. Murder during the commission or attempted commission of a robbery.[**4**] *In this case the felony is robbery. And the law says when murder occurs*

---

[**4**]     The prosecutor probably meant to refer to "felony" at this point rather than "robbery," thereby giving the standard definition of felony murder: "The felony-murder

9

*during the commission of a robbery, it is first degree murder*." (Italics added.) The prosecutor also told the jury: "So the question[ ] you ask is *did the killing occur during a robbery*?" (Italics added.)

Norris's iPhone was apparently never recovered. The information alleged Harris had committed murder "while . . . engaged in the commission of the crime of robbery." At trial, the prosecution clearly proceeded on the theory Norris had been killed during the commission of a completed robbery. Moreover, in addition to convicting Harris of first degree felony murder the jury also convicted him of robbery in a separate count.

As the Attorney General points out, this situation is almost exactly the same as *People v. Mickle* (1991) 54 Cal.3d 140, 174-175, which concluded that even if the trial court erred by failing to define "attempt," there could have been no resulting prejudice: "The jury was instructed that defendant could be found guilty of first degree felony murder if the killing occurred during the '*commission of or attempt* to commit' a lewd and lascivious act upon a child under the age of 14. (Italics added.) However, the information, instructions, and written verdict form stated that the jury could find the special circumstance to be true if the killing occurred while defendant was 'engaged in the *commission of*' a lewd act. (Italics added.) The jury received an instruction defining lewd and lascivious conduct under section 288, subdivision (a) (section 288(a)). No instruction defining attempt was given. . . . [¶] Defendant insists the trial court erred prejudicially by failing to instruct sua sponte on the elements of attempt. . . . [¶] Even if the attempt instructions were incomplete, no prejudice occurred. The prosecutor argued at the close of the guilt phase that defendant unlawfully committed two lewd acts upon Lashan shortly before the murder, namely, compulsory disrobing and forcible rape. [Citation.] No attempt theory was urged. Similarly, the information, instructions, and

---

rule broadens criminal liability, imposing a kind of vicarious liability for murders that occur during the commission of a felony. A defendant may be convicted of murder under the felony-murder rule if he is involved in the commission of a felony during which a murder occurs, even if he does not do the killing." (*Clark v. Brown* (9th Cir. 2006) 450 F.3d 898, 914.)

verdict form spoke only in terms of a completed lewd act at the special circumstance phase. Because jurors found the special circumstance to be true, they necessarily found such a completed act, and thereby foreclosed any speculation that they based either the first degree murder verdict or the special circumstance finding on some unknown, incorrect theory of attempt. [Citation.]"

The same was true here. The prosecution, which did not put forward an attempted robbery theory, argued Harris was guilty of a completed robbery and, by separate count, the jury found him guilty of a completed robbery.

Any error by the trial court in referring to the attempted commission of robbery was harmless.

3. *Lesser included offense instructions.*

Harris contends the trial court erred by not instructing the jury, sua sponte, on second degree murder and involuntary manslaughter as lesser included offenses of premeditated and deliberate first degree murder. This claim is meritless.

Citing *People v. Anderson* (2006) 141 Cal.App.4th 430, Harris argues that "when the defendant has been charged in the accusatory pleading with the crime of murder, as in defendant's case, and the prosecution proceeds on a theory of felony-murder, instructions on second degree murder and/or manslaughter are required if there is substantial evidence to support a finding that the events did not constitute felony murder but did amount to either second degree murder or manslaughter." But *Anderson* is inapposite because neither of these conditions was met here.

The defendant in *Anderson* was charged with malice aforethought first degree murder but, *after the close of evidence*, the prosecution amended the information to charge felony murder. In addition, the defendant was never charged with any predicate offense in support of a felony murder theory. The trial court instructed the jury on felony murder, but gave no instructions on first degree murder with malice aforethought, or second degree murder, or voluntary manslaughter. In this situation, *Anderson* held the defendant was entitled to instructions on second degree murder and voluntary manslaughter for two reasons: (1) amending the information after the close of evidence

11

could not nullify the legitimate expectation created by the original information that the defendant could be convicted on a malice murder theory; and (2) there was substantial evidence in the record to support a finding the killing had not been felony murder.[5] (*People v. Anderson, supra,* 141 Cal.App.4th at pp. 445-446.)

Here, although Harris was charged in the information with malice aforethought murder, he was also charged with a felony-murder special circumstance based on a homicide during the commission of robbery, a special circumstance that the prosecutor dismissed after the first day of testimony in this four-day trial. Moreover, the prosecutor's opening statement to the jury very clearly announced he was not going to try to prove malice aforethought murder, but only the crime of felony murder based on the predicate offense of robbery. Hence, the "notice" issue here was very different from *Anderson*, where the malice murder charge was not taken off the table until after the close of evidence.

Moreover, there was simply no evidentiary basis in this case for anything other than a felony-murder charge. In *Anderson* there was evidence showing both that the defendant had not committed felony murder *and* that she had committed some lesser included offense: "[T]here was substantial evidence supporting a finding that defendant was . . . a participant in the homicide. Although she did not apply the fatal blow to the victim, she told the police that she assisted Gonzales during the struggle by attempting to restrain the victim and take the broken crack pipe from his hand. Defendant concedes that these acts would have supported a finding that she was an aider or abettor of the killing. [¶] Finally, there was substantial evidence to support a finding that the

_____

[5]     There was evidence that the defendant in *Anderson* had not formed the intent to commit the predicate felony until *after* the victim had already been mortally wounded: "Defendant's description of the chain of events, combined with the pathologist's testimony, constituted substantial evidence to support a conclusion that defendant did not decide to take the victim's money until he had been mortally wounded. If the victim had already received the fatal blow when defendant first formed the intent to take his money, her participation in the killing was not a felony murder." (*People v. Anderson, supra,* 141 Cal.App.4th at p. 447.)

12

homicide, if not a felony murder, was either second degree murder or voluntary manslaughter, the latter motivated by a sudden quarrel or imperfect self-defense." (*People v. Anderson, supra,* 141 Cal.App.4th at p. 447.) *Anderson* acknowledged the proper general rule in such situations was the following: " 'When the evidence points *indisputedly* to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder.' " (*Id*. at p. 448.) However, *Anderson* held that "the evidence here does not 'indisputably' indicate a felony murder, since substantial evidence supported a finding that defendant formed an intent to take the victim's money only after Gonzales had fatally crushed his larynx." (*Ibid*.)

Harris's attempt to offer a plausible alternative theory to explain the facts of his case is entirely unpersuasive. He puts forth a kind of "provocative theft" theory, unsupported by either case authority or logic, by asserting: "When an African American man in gang territory, who may or may not be a gang member, is confronted by a situation involving being chased for whatever the reason, this is an inherently dangerous situation. Because [Harris] intentionally followed . . . [his alleged accomplice into the alley] there was sufficient evidence for jury instructions on implied-malice murder, especially if [Harris] knew this person was carrying a firearm." Harris's theory is that while he may have been guilty of stealing Norris's phone, he was unaware his companion had a gun or intended to use it. Therefore, Harris committed only involuntary manslaughter or implied malice second degree murder because, by running through gang territory toward his companion while being chased by Norris and the others, he frightened the companion and caused him to shoot Norris in a panic. Apart from the fact this proposed theory is slightly preposterous, the jury convicted Harris of robbery despite having been instructed on theft as a lesser included offense. This shows the jury concluded there had indeed been a plan to use violence in order to maintain control over the stolen phone.

13

We conclude the trial court did not err by failing to instruct the jury on second degree murder and involuntary manslaughter as lesser included offenses.

4. *There was no cumulative error.*

Harris contends the cumulative prejudicial effect of the various trial errors he has raised on appeal requires the reversal of his conviction. However, we have found at most only a few insignificant errors that were clearly harmless. Harris's trial was not fundamentally unfair. (See *People v. Watson* (2008) 43 Cal.4th 652, 704 ["Whether considered independently or together, any errors or assumed errors are nonprejudicial and do not undermine defendant's conviction or sentence."]; *People v. Boyette* (2002) 29 Cal.4th 381, 468 ["Most of these missteps were minor, and none was prejudicial by itself. We also find that the combined effect of these errors was harmless and that defendant did not otherwise endure an unfair trial."].)

5. *Cruel and unusual punishment.*

Harris contends both his felony-murder conviction and his 50-years-to-life sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment. These claims are meritless.

a. *First degree felony-murder conviction not barred by Eighth Amendment.*

Harris contends his conviction for first degree felony murder constitutes cruel and unusual punishment because the Eighth Amendment "creates a categorical bar to convicting a minor of felony-murder no matter what type of punishment may be inflicted upon such conviction." This is so, he argues, because a felony-murder analysis avoids any examination of the perpetrator's state of mind, which is inconsistent with the recent line of Eighth Amendment cases discussing juvenile sentencing.[6]

---

[6] See *Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1183] [imposition of capital punishment on juvenile offenders for any offense whatsoever violates Eighth Amendment]; *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] [imposition of LWOP term on juvenile offender for non-homicide offense violates Eighth Amendment]; *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 [183 L.Ed.2d 407] ["Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" who commit homicide, although trial court could in its discretion

14

But, as the Attorney General points out, Harris has failed to cite any relevant legal authority applying the prohibition against cruel and unusual punishment to non-sentencing questions. Harris asserts that after *Furman v. Georgia* (1972) 408 U.S. 238 [92 S.Ct. 2726], the United States Supreme Court has recognized "that procedures which give rise to punishment come within the scope of the Eighth Amendment, including guilt-trial procedures." But the only basis for this assertion is Harris's citation to a series of death penalty cases, which are inapposite because, as the Supreme Court has often said, "Death is different."[7]

Harris's conviction for first degree felony murder was not barred by the Eighth Amendment.

### b. *There was no Dillon error.*

Harris contends his sentence violates the California constitution because it is disproportionate to his crimes and to his individual culpability. (See *People v. Dillon* (1983) 34 Cal.3d 441, 477-482; *In re Lynch* (1972) 8 Cal.3d 410, 423-424.) This claim is meritless.

---

impose such a punishment]; *People v. Caballero* (2012) 55 Cal.4th 262, 268 ["sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment"].)

[7] "While *Furman* did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." (*Gregg v. Georgia* (1976) 428 U.S. 153, 188 [96 S.Ct. 2909].)

Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. [Citations.] While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17, the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.' [Citations.]" (*People v. Wingo* (1975) 14 Cal.3d 169, 174, fn. omitted.)

In *Dillon*, an immature 17-year-old killed a man who had been guarding a marijuana crop that defendant and his friends were trying to steal. As the victim advanced on him with a shotgun, Dillon fired his .22 caliber rifle out of fear and panic. (*People v. Dillon, supra*, 34 Cal.3d at p. 487.) There is no comparison with the case at bar. Dillon thought he was about to be killed when he fired on the victim, while Harris and his armed accomplice stole an iPhone and shot the unarmed owner to death when he tried to retrieve his property.[8]

Harris's sentence did not constitute cruel and unusual punishment.

---

[8] In his reply brief, Harris complains that the Attorney General's focus "solely on Norris's death, without there being any idea of what the jury actually decided or why it rendered its verdicts . . . is the very type of analysis barred by *Graham, Miller, Caballero* and *Dillon*." (See footnote 6, *ante*.) If this is an attempt to raise a claim that his sentence constituted cruel and unusual punishment solely because of his age, it is raised too late. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief. [Citation.]" (*People v. King* (1991) 1 Cal.App.4th 288, 297, fn. 12; see *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 ["we do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier"]; *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 200, fn. 10 ["Ordinarily, an appellant's failure to raise an issue in its opening brief waives the issue on appeal.].)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J.


ALDRICH, J.