Filed 1/18/22  In re King CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re ANTHONY LOUIS KING, | C093956 |
| On Habeas Corpus. | (Super. Ct. No. HC202040) |

Petitioner Anthony Louis King appeals from the trial court's denial of his petition for writ of habeas corpus challenging Governor Gavin Newsom's Penal Code[1] section 3041.2 decision to reverse the Board of Parole Hearings' (Board) grant of parole. The Governor reversed the Board's decision because, in his view, petitioner "is still not able to articulate a deep understanding of the causative factors of the crime, and has not yet developed the tools to avoid turning to his dependent behavior."  We conclude the Governor's reversal lacks "some evidence" upon which to conclude, consistent with state and federal due process standards, that petitioner's release on parole would present an unreasonable risk of danger to the community.  (*In re Lawrence* (2008) 44 Cal.4th 1181, 1191.)  We accordingly vacate the Governor's decision and order the Board to release

---

[1]     All further section references are to the Penal Code unless otherwise specified.

petitioner pursuant to the conditions set forth in its decision granting him parole, subject to the Board's authority to postpone or rescind petitioner's release pursuant to division 2, chapter 4 of title 15 of the California Code of Regulations.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *The Life Crime*

The 16-year-old defendant was convicted of "the murders and robberies of Steve Patton and Raymond and Dawn Rogers. The crimes occurred over Labor Day weekend in 1987. Kenneth Bivert fired the shot which killed Steve Patton in the early morning hours on Sunday; both Bivert and defendant shot the Rogerses the following Tuesday. Defendant did not deny being present when Patton was killed and then taking his money and truck or that he shot the Rogerses and then took their money and car." (*People v. King* (1991) 1 Cal.App.4th 288, 290.)

### A

### *Murder Of Patton*

"Steve Patton was murdered in the early morning of September 6, 1987, while fishing at Portuguese Bend near Knights Landing. He arrived late Saturday evening in his pickup truck. Defendant and Bivert were spending the night on the river, drinking a case of beer and shooting guns. Defendant brought his .12-gauge shotgun and Bivert brought his .22-caliber revolver. On three occasions that evening, they talked and drank beer with Patton as he fished. After their second visit, [others] arrived at the bend. After the . . . group left, defendant and Bivert returned to Patton and Bivert shot him with defendant's shotgun." (*People v. King*, *supra*, 1 Cal.App.4th at p. 291.) Defendant and Bivert threw Patton's fishing equipment into the water and took his truck, which they later drove into a slough to conceal it. (*Id*. at p. 292.)

"Defendant testified about his general fear of Bivert prior to Labor Day weekend. Bivert had never threatened him before that weekend. Defendant was

2

generally afraid of Bivert and tried to avoid him. He was afraid Bivert might kill him because he would wave his .38-caliber revolver in people's faces. He and Bivert were part of a larger group who planned to spend the night at Portuguese Bend, but the other friends decided not to go." (*People v. King*, *supra*, 1 Cal.App.4th at p. 292, fn. omitted.) Defendant further testified that, "[a]fter Patton was shot, defendant froze and then exclaimed to Bivert that he 'did not believe [he] did that.' Bivert started throwing the fishing equipment into the water. Defendant said, 'I didn't want no part of it, I didn't shoot him, that I wasn't involved in it.' Bivert told defendant that he 'was just as guilty as [Bivert] was because I was there and it was my gun. And that, um, it was his word against mine that I didn't do anything, or something like that.' After this exchange, defendant said nothing else but began throwing Patton's equipment into the water. He got Patton's truck keys '[b]ecause Kenny told me to get them.' Defendant testified that the next day he was scared because of Bivert and because he knew he was in trouble. When asked if he was afraid of anything in particular, defendant responded, 'I was afraid he might do it to me.' This fear was not based on threats or menaces from Bivert but from witnessing Patton's death.

"Defendant failed to report Patton's murder because he was 'terrified' from the incident and 'was kind of in a black of what happened.' Even though he was home with his parents Sunday and Monday, it never occurred to him that they could help him if he confided in them." (*People v. King*, *supra*, 1 Cal.App.4th at p. 293, fn. omitted.)

B

*Murder Of The Rogerses*

"Bivert testified that on Monday night he, defendant and another friend Adrian decided to rob the Bank of America in Knights Landing. Bivert denied threatening defendant at any time. The plan involved stealing a car to get away, driving to the airport and flying to Mexico. On Tuesday morning, Bivert took his grandfather Griffin's guns -- a .44-caliber magnum and a .38-caliber special -- and met defendant at the bus stop.

3

Bivert gave defendant the .38-caliber revolver. Adrian decided not to go. After shooting up all their ammunition and going back to town for more, they walked toward the dam. They saw the Rogerses' car in the distance and decided to steal it. They had decided to steal the car because defendant could not find one without locked steering which he could hot-wire. They first discussed holding the gun on the owner and demanding the keys, then jointly agreed to shoot them. Bivert recalled that the shooting was initially his idea but that defendant agreed. Bivert testified that they asked the Rogerses if they were catching anything, then both began shooting. Bivert saw defendant shoot both Mr. and Mrs. Rogers.

"As soon as the Rogerses were dead, Bivert threw their fishing equipment into the water and defendant went through Dawn's purse, taking money and the keys. Defendant then pulled both bodies into the water. They left in the Rogerses' car, drove back to Knight's Landing and got gas. They saw a sheriff in town and decided they were too scared to rob the bank. Bivert testified that he intended to kill both the Rogerses in order to get their car." (*People v. King*, *supra*, 1 Cal.App.4th at pp. 293-294.)

Defendant testified "he did not agree to rob the Bank of America with Bivert on Monday night. He and Adrian only agreed to give Bivert their decision about participating in the robbery on Tuesday morning at the bus stop. That morning, defendant neither agreed nor refused to go rob the bank with Bivert. He believed their plan was to skip school and go target shooting. In addition to the pistols, Bivert brought a hat. He cut eyeholes out of it at the bus stop and joked about robbing a bank. After getting more ammunition, they returned to the river by the boat dock with two boxes of handgun shells and two boxes of shotgun shells, the .38-caliber special, the .44-caliber magnum and the .12-gauge shotgun. Defendant recalled running into David Williams at the boat dock and talking to him about robbing a bank. They then walked down to the slough. Bivert mentioned that he wanted to get a car that was sitting there to rob the bank. Defendant did not respond. Bivert suggested that they could get the car keys from

4

the people and take it.  They were close to the car at this time.  Bivert then threatened defendant.  'Before we went down there, he said, if he started shooting, that I better start shooting or that he was going to blow my head off, or he was going to do the same to me as he did to the rest, or something to that effect.'

"Defendant testified that he believed Bivert would kill him if he did not start shooting when Bivert did.  Defendant 'wondered' whether he would, but the thought that Bivert might not shoot him 'passed real quick.'  They then walked from the car toward the Rogerses.  Defendant did not walk away because he was panicked and thought he would be shot in the back; he did not shoot Bivert because he was less experienced with handguns than Bivert; and he did not try to warn the Rogerses due to panic.  They walked by the car without checking to see if it could be hot-wired.  After they reached the Rogerses and Bivert fired several times, he looked at defendant and said, 'you better get to shooting.'  Defendant then pulled out the .38-caliber revolver, closed his eyes and started shooting.  He fired five of his six rounds with his eyes closed.  He made no conscious effort to either aim at the Rogerses or away from them.

"Defendant did not try to get away from Bivert over the next three days because he was scared.  They eventually went to the house of defendant's friend Shane Brumble in Oregon.  Defendant told Brumble that they had shot two people in self-defense because he thought Shane would turn them in.  Defendant thought it would be better to get caught than for anybody else to be killed or for him to be killed.

"Defendant testified that he could not remember Bivert ever threatening him until he was standing on the levee where the Rogerses were fishing.  Bivert did not threaten him after shooting Patton.  Even though he was afraid of Bivert, he did not know for sure if his death was imminent."  (*People v. King*, *supra*, 1 Cal.App.4th at pp. 294-295, fns. omitted.)

"The jury returned verdicts of guilty on all murder and robbery counts and their special findings.  Not guilty verdicts were returned on both counts of grand theft-firearm.

5

Defendant was sentenced to state prison for 52 years to life." (*People v. King*, *supra*, 1 Cal.App.4th at p. 296.)

## II

### *Petitioner's Background*

The following was taken from the comprehensive risk assessment (assessment) prepared by a forensic psychologist in advance of the parole hearing.

Petitioner is "the younger of two boys born to the married union of his parents. [He] described having a 'good family' with no history of mental illness, substance abuse, or legal issues during his childhood. He described good relationships with his parents and brother. He denied childhood history of physical abuse, emotional abuse, sexual abuse, or witnessing domestic violence.

"Around age two [petitioner] was diagnosed with Perthes Disease. His treatment included having a leg sling and walking on crutches. This condition was resolved by about age five prior to his entering kindergarten. When he was around 10 years old, his mother began working outside the house, leaving him and his brother with unsupervised time alone after school. [Petitioner] described being a 'latch-key' child [and] 'lonely.' Around second grade (about age seven), he was diagnosed with dyslexia and placed in special education classes. This led to a sense that he did not 'fit in' with other students. He noted that he was teased daily by his peers 'partly due to acne, partly due to my learning disabilities.' In response to teasing, he was involved in a few fights starting in elementary school.

"[Petitioner] reported that in junior high school (around age 13), he began to behaviorally act out, citing that he felt that his parents favored his older brother, and also felt ignored and invisible to others. He explained, 'I started acting out and had a couple run-ins with the law, but even negative attention is attention.' He noted that around age 13 (while in junior high school), he broke into three or four cars and broke into a swap meet building to steal various items. He explained he committed these acts 'to get

6

attention from the other kids by bragging about it and showing them the stuff.' These thefts resulted in four criminal charges, of which he pled guilty to one charge and the others were dropped. He was sentenced to juvenile hall, work detail, brief court-ordered psychological treatment, probation, and restitution.

"Around age 14, [petitioner] began hunting (with a license), fishing, and riding motor cycles with his friends. He noted that he only carried guns when hunting. He described spending time with some peers [who] were positive influences, and some peers [who] were negative influences. As a teen, he was employed as a prune dehydrator and lawn care worker. He denied ever being fired or generating income illegally. He completed the 10th grade, and was a few days into the 11th grade when he was arrested for the life crime.

"[Petitioner] acknowledged childhood history of truancy, special education classes, learning disability, detention, juvenile arrests (at age 13 and at age 16), alcohol and cannabis use, a few fights, breaking into three or four cars, breaking into a building, one juvenile hall placement, and one successful completion of juvenile probation. At age 16, he committed the life crime with a 17-year-old peer.

"[Petitioner] denied a childhood history of other forms of problematic behavior, including school attendance while under the influence of drugs or alcohol, school suspension, school expulsion, placement in continuation school, shoplifting, vandalizing property, animal cruelty, starting fires, or gang involvement."

## III

### *The Assessment*

The forensic psychologist outlined petitioner's psychosocial development and criminal history, and provided a clinical assessment of petitioner's risk for violence. The psychologist concluded, "Mr. King represents a low risk for violence." The psychologist noted, however, that petitioner had "one prior Comprehensive Risk Assessment, which was completed by D. Wildman, Ph.D., in 2014. Dr. Wildman diagnosed [petitioner] with

7

Other Specified Personality Disorder, with antisocial and dependent features. The doctor opined that [petitioner] represented a moderate risk of violence."

Petitioner "demonstrated minimal violence-related behavior prior to the instant offense. He has not incurred any violent disciplinary infractions while incarcerated." Petitioner has not been involved with the security threat group and has not had any violent rules violation reports while in prison. Petitioner has, however, "been the subject of two Rules Violation Reports" for possessing a syringe in 1997 and possessing a single edge utility razorblade in 2001, and "been the subject of approximately four 128a Counseling Chronos between 1999 and 2004."[2] The psychologist explained: "The ultimate findings and dispositions of each [rules violation reports] and Counseling Chrono are documented in the disciplinary tab of the inmate's central file. [Petitioner] clarified that he was in possession of the razor blade to use for his hobby craft. Records regarding the [rules violation reports] for a syringe, note that [petitioner] was tested for drugs (with no notation of a positive finding), and when medically examined, no needle marks were found, making his statement regarding holding the syringe for someone else plausible." The psychologist also noted that, "[w]hile incarcerated, [petitioner] has consistently been placed in the General Population with no need for mental health services."

As to education, the psychologist noted petitioner passed the general educational development test, and earned his high school diploma, two associate of arts degrees, and an associate of science degree while incarcerated. Petitioner has further "upgraded with training in cabinet making, electronics, sewing, and auto mechanics," "completed basic and advanced Alternatives to Violence Project" classes, and participated in a study group studying Native cultures. "Mr. King maintained various work assignments in prison.

---

[2] The assessment contains no description of the term "128a Counseling Chronos."

Available work supervisor's reports noted satisfactory and above work performance. He is currently assigned as an [Americans with Disabilities Act] worker."

The psychologist explained petitioner's "childhood history suggests violence-related factors including: trauma related to physical disability, learning disorders, and peer teasing, which may have set the stage for [petitioner] seeing the world through the lens of being different, less than, or unimportant. It appears he sought to bolster his low self-esteem with criminal behavior and substance use." Although the psychologist concluded petitioner "does not meet the criteria for any major mental disorders," she found the "constellation of symptoms [presented by petitioner], although somewhat mitigated at this time, are consistent with features of Dependent Personality Disorder." Those symptoms include: "submissiveness, lack of confidence requiring the assurance of others, difficulty disagreeing with others, fear of disapproval, going to excessive lengths to obtain support, pessimism, and self-doubt." In the psychologist's opinion, "[t]hese features were contributing factors to the life crime, and were particularly salient in his adolescence and early adulthood. Although Mr. King has worked to mitigate these characteristics, they are entrenched features, and remain moderately relevant." The psychologist diagnosed petitioner with a dependent personality disorder with antisocial traits. As to antisocial behavior, however, the psychologist explained: "Mr. King . . . does not present with significant antagonism, hostility, interpersonal dominance, deceitfulness, or related features of persistent antisociality. His total PCL-R score is far below the mean of North American male inmates, and well below the cutoff or threshold commonly used to identify dissocial or psychopathic personality. This risk factor is of low relevance."

Petitioner "indicated his Wiccan beliefs as contributing positively to his life, noting, 'I try to attune myself with nature. Live and let live type thing. I don't force my beliefs on someone else and I don't let them force their beliefs on me.' When asked whom he spends time with while in prison, [petitioner] reported, 'I associate with a lot of

9

different people. In here, I try to associate with everybody but keep most at an arms distance. I choose positive influences. Our pod doesn't tolerate any drugs or alcohol; we'll have you moved out. We are on the right path, and looking to get out of prison.' "

The psychologist determined petitioner "presented with a viable parole plan." Petitioner explained "he would like to stay in a transitional living program for a year or two," then live with his mother until he is financially stable, and finally move into his own apartment. He discussed employment options and indicated "he would like to start his own business as a cabinetmaker like his father." "When asked what resources he would be accessing in the community, [petitioner] stated, 'Anger management, victim impact programs, one goal is to work with youth.' "

In analyzing the historic factors pertinent to assessing petitioner's risk of violence, the psychologist noted: "Mr. King demonstrated violent attitudes and behavior at the time of the life crime when he was 16 years old. Mr. King has not incurred any violent [rules violation reports] while incarcerated. Mr. King does not appear to have a pattern of using violence to resolve issues or a pattern of emotional dyscontrol resulting in violent outbursts. Given the infrequency and temporal distance from his violence, these risk factors are of low relevance." The psychologist noted, however, that petitioner is vulnerable to the influences of negative peers, which was a contributing factor to the life crime. Given petitioner's history, the psychologist believed his vulnerability to negative peers "remains moderately salient and could have great significance should he return to associating with negative influences."

In the analysis of the clinical factors portion of the report, the psychologist wrote: "Mr. King demonstrated some issues related to insight, which is of low relevance due to his consistent ability to maintain prosocial behavior and avoid the influence of negative peers for the past 16 years. He has not demonstrated recent issues related to violent attitudes, symptoms of major mental disorder, instability, or supervision response.

10

"In discussing his version of the controlling offense, Mr. King accepted responsibility for his actions, and expressed remorse. He acknowledged susceptibility to negative peer influences. He was able to discuss underlying personality traits that made him vulnerable to engaging in violence, and how these factors may impact his future decision-making and behavior. He struggled to explain why he would stay with his co-defendant for several days after the first murder. He attributed it to fear, but that does not seem to make sense given the period of time between the first and second murders."

The psychologist included a verbatim summary of a portion of her conversation with petitioner regarding the life crime. After petitioner recounted his version of the events surrounding the life crime, the psychologist asked petitioner various questions. The psychologist set forth the discussion as follows, noting her questions were italicized: "When asked what motivated him to commit the life crime, Mr. King stated, 'The first one, I didn't really believe it was going to happen, and once it did, I felt I was just as guilty as him and I was just getting out of there. The second one was fear.' [*Q: Why didn't you get away from Kenny?*] 'I had a blackened-out state of disbelief. Part of it was fear. Kenny made threats toward me and my family, if I told anyone he would kill my parents as well as myself.' [*Q: Did you think of asking your parents for help?*] 'I didn't know how to do that without jeopardizing my family's safety. I was scared.' [*Q: What became of Kenny?*] 'He's on death row. He hasn't stopped stabbing and killing people since he came to prison. He slit a guy's throat at Salinas Valley. Now I am in [a sensitive needs yard] because I testified against him for that. I may not have been able to stop him in in the past, but I stopped him now.'

"Mr. King indicated that the causative factors of the crime were, 'I think part of it, I was, I wanted to belong to something friendship-wise so bad and I didn't have much empathy, I didn't really care about anyone's feelings but mine at the time. I was doing things I knew were wrong but it got me the attention I wanted, so I didn't care. I didn't think before I acted. I just did things. When I did do things there wasn't really a

11

punishment for them, it was glossed over. I didn't feel there would be any consequences for what I did because there hadn't been any in the past.' Mr. King added, 'Had I not been with Kenny, I would not be here today for this crime. I would not have killed them.' [*Q: Why would [you] stay with a guy after the first shooting?*] 'Fear, loyalty to him, not understanding how to get out of it.'

"[*Q: How did you escalate from a few thefts at 13 to murder at 16?*] 'I should have stopped socializing with Kenny a year before. That's when he started getting out of control. Part of the fear of seeing the first murder lead [*sic*] to my involvement in the second one. Had I made the choice to get away from him before it happened. He was doing things to impress his dominance on others, me and others.'

"[*Q: What was your trigger for the life crime?*] 'My lack of caring and my antisocialism, wanting to fit in at any cost.' [*Q: Why don't those issues trigger you now?*] 'I made myself a promise when I got sentenced that unless I absolutely had no choice, I would never commit another violent act in my life, and I would further better myself.'

"[*Q: How are you dealing with that need to fit in?*] 'I no longer have that need to fit in. Every time something comes up of negative in nature, I think of Steven, Dawn and Ray, and I go the other way. I also try to talk others out of doing negative things too. I helped people sign up for college classes and told them you don't need to please those other people, you need to please yourself. Now I look myself in the mirror, and see if I've done a good job. I don't care what others think.'

"When asked about the character defects that contributed to the life crime, Mr. King stated, 'Lack of caring for other people's feelings, lack of responsibility, lack of understanding.' Mr. King reported that his attorney did a good job, and his sentence was fair, adding, 'I probably should have gotten worse.' He noted that he feels responsible and remorseful for the crime."

12

As to petitioner's risk of future violence, the psychologist provided the following case formulation and opinions: "Mr. King's violence risk is driven by his antisocial behavior, Dependent Personality Disorder, and susceptibility to negative peers. Because of Mr. King's history and the entrenched nature of his personality disordered traits, there will likely be some ongoing violence risk issues that he manages rather than issues that he eliminates. Although Mr. King is unable to describe why he became involved in three murders over several days without seeking outside assistance, to his credit, he takes responsibility for his actions, and he has a basic understanding of his aggressive behavior and susceptibility to negative peers that precipitated the life crime. He has worked to address these issues while incarcerated, and for the past 16 years appears to have made prosocial choices and associated with prosocial peers.

"Mr. King is commended for his avoidance of [security threat group]/gang affiliation, abstinence from substance use since 1999, avoidance of disciplinary infractions since 2004, and avoidance of violence in general. Additionally, he is commended for participating in self-help opportunities, upgrading educationally and vocationally, maintaining a positive employment history while incarcerated, maintaining family relationships despite long-term confinement, developing a prosocial peer group, subscribing to a spiritual path which he finds beneficial, and developing a viable parole plan. Mr. King espouses prosocial attitudes and his behavior is congruent with this.

"In terms of the five stages of change model, (e.g., Pre-contemplation [not ready]; Contemplation [acknowledging a problem]; Preparation [getting ready]; Action [changing behavior]; and Maintenance [maintaining the behavior change]), Mr. King is seen as being in the Maintenance Stage of change.

"Based upon an analysis of the presence and relevance of empirically supported risk factors, case formulation of risk, and consideration of the inmate's anticipated risk management needs if granted parole supervision (i.e., intervention, monitoring), Mr. King represents a low risk for violence. He presents with non-elevated risk relative to long-

13

term inmates and other parolees.  Low-risk examinees are expected to commit violence much less frequently than all other parolees."

IV

*The Parole Suitability Hearing And The Board's Decision*

We summarize only the testimony and questioning at the parole hearing pertinent to the Governor's decision to reverse the Board's grant of parole.  We do not, in that regard, minimize the statements made by the victims' family members regarding the impacts of the horrific crimes on their lives.

Petitioner testified he committed crimes and did "crazy things like jump off the drawbridge" as a youth because he was seeking the attention of his peers.  Petitioner explained:  "I felt like an outcast. . . .  I was always being teased about my reading, about my red hair, about my acne, and I was trying to fit in.  And so, I . . . would do things to get the attention of the other kids . . . in hoping that I would be accepted by them."

Petitioner described the facts of the life crime and, when asked why he continued to associate with Bivert after the first murder, said, "[a] part of it was fear" because "he had made threats towards [himself] and [his] family" and "part of it was immaturity."  When asked why he murdered the Rogerses, petitioner replied:  "Uh, part of it was due to the fear of . . . the threats that he'd made.  Part of it was due to immaturity.  Part of it was lack of understanding of how to get out of the situation I was in.  Uh, and at the time . . . I didn't really have a sense of . . . respect or empathy for other people's feelings.  Uh, I didn't really understand . . . the nature of loss."

The presiding commissioner asked petitioner why he did not have empathy for people.  Petitioner said:  "Uh, because . . . I was bullied and . . . teased a lot when I was a kid.  So, I didn't feel that people really had any kind of sympathy or remorse <inaudible> or . . . feelings for me.  And so, . . . I had that kind of attitude.  If they don't have any feelings for me, why should I have feelings for them."  Petitioner discussed his remorse over the murders and explained he seeks to better himself every day and help others.

14

The presiding commissioner asked petitioner questions about the dependent personality disorder with antisocial traits diagnosis. Petitioner testified he understood that to mean "[t]hat I depend on other people for acceptance" and "the antisocial side is that I don't really like to be around other people."

Petitioner explained he testified against Bivert in another case even though he knew he "would be labeled a rat" and would be "an open target on any mainline there is to be hit because . . . [he] was telling on a fellow inmate." He said he did it because he "didn't stop [Bivert] in the past and [he] figured, that was [his] chance to stop him from bringing harm to anybody else in the future."

The deputy commissioner said: "[W]e would like to know what tools that [*sic*] you've developed that are going to keep you from ever becoming that person again or being anything near it. What's going to show that . . . you're not an unreasonable risk if you're released. So, out of these programs that you've done, . . . which ones would you say were the most important to you?" Petitioner replied: "[T]he victims' awareness offender program . . . really touched home with me because of the things that it taught you. Uh, for example, . . . I know my crime didn't just create the . . . victims at question. It's like, dropping a pebble in a pond. You have your initial, but it keeps going out and out and out, affecting people you'll never even see or know. But I know that it . . . affects the community as a whole." Petitioner acknowledged the difficulty for the family members left behind, stating: "I wish I could change that. I can't. Uh, that's something I'll never be able to forgive myself for."

The deputy commissioner noted a prior parole suitability hearing panel "said [petitioner] lacked insight into [his] crime" and "needed to find [his] character defects and [his] causative factors." Petitioner identified his three main character defects as "used to be impulse control," "wanting to fit in . . . to the point I do anything to fit in," and "lack of . . . acceptance of responsibility." Petitioner further identified his three biggest causative factors as bullying, teasing, and humiliation for not "being up to par

15

with other kids [his] age." Petitioner later explained that, although low self-esteem sometimes "comes up," he stops to "reevaluate himself" and ask whether he is "doing the right thing," if there is "some benefit to it," and whether what he is doing is helping himself or others.

Petitioner lives "in a pod with other inmates" who are "all programmers . . . trying to do things to better themselves." He explained they "don't tolerate drugs or alcohol or . . . fighting, or anything of that nature in the pod" and thus ask staff to move someone out of the pod if a problem arises. The deputy commissioner asked: "Okay, so, let me ask you this. Right now, you can control your pod. Let's say you're paroled, and let's say you're eventually out of transitional housing and you're living in an apartment complex. You're not making a lot of money, but you're living in an apartment complex and, uh, you find out that your two roommates, so, you have two. Um, are doing drugs -- just marijuana, alcohol. Um, how are you going to handle that situation?" Petitioner said he would request to move to another apartment, even if he were friends with his roommates because "that's not my, my program."

The deputy commissioner next asked questions regarding petitioner's relapse prevention plan. Specifically, the deputy commissioner wanted to know what petitioner believed his "biggest triggers" are "that would most likely cause [him] to go back to a criminal lifestyle if [he] weren't to avoid them or deal with them." Petitioner responded he "still struggle[s] with the . . . loneliness part, wanting to fit in with somebody else," his "need for acceptance," and his "need to please people." The deputy commissioner returned to his prior hypothetical and asked petitioner what he would do if his roommates were his only friends and told him, "we're probably not going to want to hang out with you anymore," if petitioner asked to move to another apartment. Petitioner said he "would still have to go find new friends because . . . that's not the program [he] want[s] to live under." He wants to choose friends who are supportive, uplifting, and living the right lifestyle, and people who can help him through the "dark spot[s]." Petitioner later

16

clarified "there's always going to be a need for acceptance, but I've come to the realization that as long as I know I'm doing the right thing and I'm on the right path . . . it's not really so much important to me anymore what . . . people think because . . . there's always someone else that's of positive mind that I could find [who] would support positive growth versus negative growth."

Petitioner said that, if he could go back in time "[w]ith the skills that [he has] nowadays," he "wouldn't have been [at the scene of the crimes] in the first place" because as soon as Bivert started "spinning out of control, [he] would have started distancing [himself] from him and tried to get him . . . some kind of counseling assistance," whether by contacting the local sheriff or calling a hotline number.

After the hearing, the Board panel "reconvened for pronouncement of the panel's decision." The presiding commissioner outlined the evidence considered in rendering the decision and announced, "we find that you do not pose an unreasonable risk to public safety and therefore you are suitable for parole." The presiding commissioner discussed petitioner's aggravating factors, including the horrific and heinous nature of the murders, and petitioner's self-control issues (e.g., "doing crazy and wild things to impress others and fit in"), substance abuse, and impulsivity around the time of the murders. The panel determined, however, petitioner's aggravating factors were outweighed by his mitigating factors.

The presiding commissioner explained the assessment "gave [petitioner] a low risk of violence" and petitioner had a nonviolent prior criminal history and committed the murders at 16 years old. The panel gave "great weight to the . . . youth offender factors." Further, petitioner had participated in several educational programs and obtained several degrees, he testified against Bivert "at great peril to [his] own safety," and despite a few rule violations, there had "been no violence in prison." The primary mitigating factor, however, in the panel's opinion was "the offender change."

17

The panel believed petitioner was credible, his "remorse expressions were adequate," and his "insight was adequate." The presiding commissioner explained: "You talked about the fear, the immaturity. It's a big factor at 16 years old. Trying to fit in and you knew that was an issue even prior to this, and again, the comprehensive risk assessment knows -- cited those issues, some of the lack of insight but still rated you as low. In fact, the comprehensive risk assessment on page eight states that, Mr. King demonstrated some issues related to insight, which is of low relevance due to his consistent ability to maintain prosocial behavior and avoid the influence of negative peers for the past 16 years. He's not demonstrated recent -- recent issues related to violent attitudes, symptoms of major mental disorder, instability, or supervision response. You took responsibility for the crime." The presiding commissioner further noted petitioner's age "reduces the probability of . . . recidivism" and his "plan for release is also mitigating," especially given his electrical and cabinetry skills and his "educational upgrades."

As to petitioner's risk factors, the presiding commissioner said: "[Y]ou have . . . realistic plans to manage the risk factors and it's good that you recognize that you still have issues. Now, you're directing them at prosocial influences that you want to please but, uh, your plans as written here, are adequate. We think that those will help you manage the risk factors that are still out there and you have insight into what they are, so we're comfortable that you're adequately prepared to go out in society." Although petitioner is "susceptible to negative influence" and he has a "dependent disorder," the presiding commissioner said: "We're glad that you recognize it's still a, as a factor that you need to continue to work on. You are exposed to . . . deviant peers, Mr. Bivert, to name one, and it looks like you turned around and testified against him and have not engaged with any other negative peers that we can see since the syringes" in 1997. "So, that's about 23 years ago. But back in when you're 16 you did have this issue as a hallmark of youth that we thought was . . . present and had a mitigating effect overall.

18

And you were reckless lack [*sic*] the ability to understand [the] danger of your actions to yourself and others, you admitted that. And we have seen subsequent growth and increased maturity in you as I just indicated by your institutional behavior, lack of infractions since 2004."

The presiding commissioner concluded the hearing by stating: "Based on all this, we find that you do not pose an unreasonable risk of danger or a threat to public safety. Accordingly, the panel finds you suitable for parole."

V

*The Governor's Reversal Decision*

The Governor "acknowledge[d] that Mr. King committed this crime when he was 16 years old and that he has since been incarcerated for 32 years." The Governor explained he "gave great weight to all the factors relevant to [petitioner's] diminished culpability as a youthful offender -- recklessness, excessive risk-taking, and his lessened ability to anticipate and appreciate consequences -- and his other hallmark features of youth." The Governor further noted petitioner's "life was shaped by the negative influences of his youth and that these experiences contributed to his criminality." And, the Governor acknowledged "that Mr. King has made efforts to improve himself in prison" by earning "three associate degrees, [developing] a vocational skill, and [maintaining] continuous employment throughout his incarceration." The Governor reasoned, however, that "these factors are outweighed by negative factors that demonstrate he remains unsuitable for parole at this time."

The Governor explained: "I am troubled that Mr. King does not better understand how he came to commit these murders. At his comprehensive risk assessment, Mr. King explained to the clinician that, had it not been for his crime partner, he would not have killed the victims. Mr. King explained his reasons for committing the life crime as 'fear, loyalty to [his crime partner and] not understanding how to get out of it.' At his hearing, the Board asked why he committed this crime, and Mr. King stated, 'I felt like an

19

outcast. . . . I was always being teased about my reading, about my red hair, about my acne, and I was trying to fit in. And so I, I would do things to get the attention of the other kids . . . in hoping that I would be accepted by them.' I acknowledge that Mr. King was a youth when he committed this crime, however, it is concerning that Mr. King is still not able to articulate a deep understanding of the causative factors of the crime, and has not yet developed the tools to avoid turning to his dependent behavior.

"The evaluating psychologist shares my concerns, and noted that Mr. King is particularly susceptible to peer pressure. The clinician observed that 'these features were contributing factors to the life crime, and were particularly salient in his adolescence and early childhood. Although Mr. King has worked to mitigate these characteristics, they are entrenched features, and remain moderately relevant' risk factors.

"I commend Mr. King for his positive institutional record and encourage him to maintain his good conduct. However, Mr. King must understand the factors that led him to commit this crime and gain the skills necessary to avoid returning to dependent behavior before he can be successful on parole and released into the community."

The Governor concluded: "I have considered the evidence in the record that is relevant to whether Mr. King is currently dangerous. When considered as a whole, I find it shows that he would pose an unreasonable danger to society if released from prison at this time. Therefore, I reverse the decision to parole Mr. King."

VI

*The Trial Court's Decision*

Petitioner filed a petition for habeas corpus in the trial court, challenging the Governor's reversal decision. The trial court "d[id] not agree with petitioner that the Governor misconstrued petitioner's statements or his meaning" in reviewing the assessment and petitioner's testimony at the parole suitability hearing. The trial court denied petitioner's petition for habeas corpus, stating "[t]he Governor's conclusion reversing the parole board was based on evidence of petitioner's current dangerous"

20

because "[t]he Governor was concerned that petitioner was not able to articulate a deep understanding of the causative factors of the crime and had not developed the tools to avoid returning to his dependent behavior." In the trial court's opinion, "[t]he Governor drew a connection between evidence of petitioner's lack of insight and understanding of the motivating causes of his crimes and current dangerousness."

Petitioner filed a petition for habeas corpus in this court. We issued an order to show cause and the parties submitted their respective briefs. We now consider the merits of petitioner's arguments.

DISCUSSION

"The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals *as soon as possible* and alleviate the cost of maintaining them in custodial facilities." (*In re Vasquez* (2009) 170 Cal.App.4th 370, 379.) "[T]he Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. [Citations.] The Board's parole decisions are governed by section 3041 and title 15, section 2281 of the California Code of Regulations." (*In re Lawrence*, *supra*, 44 Cal.4th at pp. 1201-1202, fn. omitted.) Release on parole is the rule, rather than the exception. (*Id*. at p. 1204.)

The Governor has the power to review the Board's decision to parole an inmate convicted of murder pursuant to article V, section 8, subdivision (b) of the California Constitution and section 3041.2. In conducting this review, the Governor is required to consider the same factors considered by the Board, which are specified by regulation.[3]

---

[3] "Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude

(Cal. Const., art. V, § 8, subd. (b); *In re Lawrence*, *supra*, 44 Cal.4th at p. 1204.)  The Governor, however, has discretion to be " 'more stringent or cautious' " than the Board in determining whether a petitioner poses an unreasonable risk to public safety.  (*In re Lawrence*, at p. 1204.)

Our review of the Governor's decision is highly deferential.  (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1204.)  "[T]he judicial branch is authorized to review the factual basis of a decision . . . denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation."  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658.)  "Only a modicum of evidence is required.  Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor."  (*Id*. at p. 677.)

Although deferential, our review "certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant

---

toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."  (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Circumstances tending to show suitability for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his, her, or their life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release.  (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision -- the determination of current dangerousness." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1210.) Because a petition for habeas relief is an original proceeding, we independently review the record to determine whether there is some evidence to support the Governor's decision to reverse the Board's grant of parole. (*In re Scott* (2004) 119 Cal.App.4th 871, 884.) Thus, although the court may not reweigh the evidence considered by the Governor, it is not limited to the evidence relied upon by the Governor in determining whether his decision is supported by some evidence. (*In re Shaputis* (2011) 53 Cal.4th 192, 214, fn. 11 (*Shaputis II*).) As our Supreme Court explained: "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1211.) Further, because the relevant inquiry is whether some evidence supports the Governor's *decision*, "not only must there be some evidence to support the [Governor's] factual findings, there must [also] be some connection between the findings and the conclusion that the inmate is currently dangerous." (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1458.)

Petitioner asserts the Governor's decision should be vacated because: (1) "the Governor imposed an unlawfully heightened standard of parole suitability illegally founded upon the circumstances of [his] life crime" because the Governor's "fabricated benchmark of '*deep* insight' exceeds and violates the boundaries of the law"; (2) "there is no evidence to support the Governor's conclusion [petitioner] lacks insight"; and (3) "there is no evidence petitioner's decades-old issue of vulnerability to the influence of negative peers and his dependent personality disorder diagnosis make him currently dangerous." (Capitalization omitted.)

The Governor argues the reversal decision is supported by some evidence because our Supreme Court has held: "that the aggravated circumstances of the life crime remain probative of current danger when the record 'establishes that something in the prisoner's

23

pre-or post-incarceration history, or his current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety,' " citing *In re Lawrence*, *supra*, 44 Cal.4th at page 1214; "an inmate's lack of insight, coupled with the aggravated circumstances of his crime, can provide a sufficient basis to conclude that the inmate remains an unreasonable risk of danger and unsuitable for parole, citing *In re Shaputis* (2008) 44 Cal.4th 1241, 1260, footnote 18 (*Shaputis I*); and a "life inmate's 'maturity, understanding, and mental state' are 'highly probative . . . of current dangerousness,' " citing *Shaputis II*, *supra*, 53 Cal.4th at page 218. The Governor believes he appropriately "drew a connection -- or nexus -- between [petitioner's] insufficient understanding of the motivating causes of his crimes and his risk of reoffending given his current lack of insight" and "properly relied on the inadequacy of [petitioner's] understanding" as "some evidence supporting his decision."

The Governor concluded petitioner was unsuitable for parole due to his inability "to articulate a deep understanding of the causative factors" -- i.e., lack of insight -- which has led to a failure to develop the tools necessary to avoid returning to his dependent behavior, particularly as to negative peer pressure. We find no evidence in the record to support this finding.

Our Supreme Court has noted that "lack of insight has played an increasingly prominent part in parole decisions and the ensuing habeas corpus proceedings."[4] (*Shaputis II*, *supra*, 53 Cal.4th at p. 200.) Lack of insight "can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can

---

[4]     Indeed, the Sixth District Court of Appeal has noted an inmate's lack of insight has "been dubbed the ' "new talisman" ' for denying parole." (*In re Ryner* (2011) 196 Cal.App.4th 533, 547.)

24

imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way." (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 547.) For that reason, "the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, at p. 218.)

Examination of a prisoner's insight requires a "particularly individualized consideration: 'expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he[,] she[, or they] has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 219, fn. 12.) "Evidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime. To put it another way, the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes *that are significant*, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*In re Ryner*, *supra*, 196 Cal.App.4th at pp. 548-549, second italics added & fn. omitted.)

Here, the Governor does not suggest petitioner has failed to develop insight into his crimes; the Governor instead believes petitioner's insight was not "deep" enough -- which we interpret to mean petitioner's insight is insufficient. At the outset, "we consider the very concept of 'insight' to be inherently vague and find that whether a person has or lacks insight is often in the eye of the beholder." (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 548.) It is questionable whether any person "can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct." (*Ibid.*) It is further questionable whether any person

25

"can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone," especially when the life crime was committed as a juvenile. (*Ibid.*) Thus, "one always remains vulnerable to a charge that he[,] she[, or they] lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse." (*Ibid.*)

The Governor believes petitioner has insufficient insight because petitioner made several statements to the psychologist that he would not have committed the murders "but for the influence of his crime partner," and he made the following statements at the parole suitability hearing: "that he 'felt like an outcast,' and mentioned that he used to get 'teased about [his] reading, about [his] red hair, about [his] acne, and [he] was trying to fit in' "; "he committed other crimes before the life crime to get attention"; and "he was looking for acceptance and was getting it from Bivert." The Governor further relies on the psychologist's statement petitioner " 'struggled to explain why he would stay with his co-defendant for several days after the first murder,' " and her skepticism that fear was the cause of him doing so, as petitioner explained. The Governor believes the foregoing, coupled with petitioner's vulnerability to peer pressure ("which [the psychologist explained] was 'a contributing factor to the life crime' and 'remains moderately salient and could have great significance' "[5]) and his dependent personality disorder (which the psychologist stated was a contributing factor to the life crime and " 'entrenched features' " that " 'remain moderately relevant risk factors' "), provide a basis for concluding petitioner is currently dangerous.

Undoubtedly there is some evidence in the record to support a finding petitioner is unable to fully articulate all of the psychological factors leading to him committing the life crime. Indeed, the psychologist determined petitioner has "some issues related to

---

[5]    As explained *post*, the Governor ignores an important caveat at the end of this quote.

26

insight" due to his inability "to describe why he became involved in three murders over several days without seeking outside assistance" and because "[h]e struggled to explain why he would stay with his co-defendant for several days after the first murder." But, the psychologist stated these issues related to insight are "*of low relevance due to [petitioner's] consistent ability to maintain prosocial behavior and avoid the influence of negative peers for the past 16 years*." (Italics added.) The Governor points to no evidence in the record to explain why he believes the lack of insight is significant or to lead to an inference that petitioner's issues as to insight have "some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 549.) As our Supreme Court explained, the Governor's "due consideration" of lack of insight "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between th[e] factor[] and the necessary basis for the ultimate decision -- *the determination of current dangerousness*." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1210, italics added.)

As to the paragraph in the assessment stating petitioner has worked to mitigate his dependent personality disorder characteristics but such characteristics "are entrenched features, and remain moderately relevant," we note the paragraph is located under the "analysis of historic factors" portion of the "assessment for risk of violence" section. In other words, the psychologist noted petitioner's dependent personality disorder remains moderately relevant to assessing his risk for violence. The psychologist did *not* state petitioner's dependent personality disorder characteristics moderately *indicate* a present risk of violence. Indeed, the psychologist concluded petitioner presents a low risk of violence despite having these entrenched features that petitioner must continue to manage -- as he has done over the past 16 years. The Governor points to no evidence in the record showing petitioner has failed to manage his dependent personality disorder characteristics or that he will fail to do so following his release.

More importantly, in the portion of the assessment relied upon by the Governor regarding petitioner's personality disorder and susceptibility to peer pressure, the psychologist wrote: "Mr. King's main issue concerning [relationships] is his vulnerability to the influences of negative peers. This factor is a contributing factor to the life crime. Given his history, this risk factor remains moderately salient and could have great significance *should he return to associating with negative influences*." (Italics added.) The Governor omitted the preceding italicized portion of the psychologist's assessment in presenting his argument in the return. The caveat is important because the psychologist determined petitioner "espouses prosocial attitudes and his behavior is congruent with this." The psychologist further wrote petitioner "has a basic understanding of his aggressive behavior and susceptibility to negative peers that precipitated the life crime. He has worked to address these issues while incarcerated, and for the past 16 years appears to have made prosocial choices and associated with prosocial peers." The Governor points to no evidence indicating petitioner will return to associating with negative influences upon his release, nor does he provide any reasoning for reaching such a conclusion.

The assessment states petitioner has "accepted responsibility for his actions, and expressed remorse." Petitioner told the psychologist the causative factors of the life crime were his need "to belong to something friendship-wise so bad," his lack of empathy, impulsivity, and need for attention, and because he "didn't feel there would be any consequences for what [he] did because there hadn't been any in the past." He further said his trigger for committing the life crime was his "lack of caring and [his] antisocialism, wanting to fit in at any cost." Petitioner "acknowledged susceptibility to negative peer influences," "was able to discuss underlying personality traits that make him vulnerable to engaging in violence," and could articulate "how these factors may impact his future decision-making and behavior." Petitioner sought to better himself during his incarceration by obtaining various degrees and vocational skills, completing

28

alternatives to violence project classes, participating in a study group, and maintaining work assignments. He has maintained prosocial behavior and avoided negative influences for the past 16 years. Petitioner presented a viable parole plan, which includes accessing anger management and victim impact programs.

During his testimony at the parole suitability hearing, petitioner again admitted his role in the life crime, expressed remorse, said he seeks to better himself every day and help others, and explained he committed the life crime due to fear of Bivert, immaturity, "lack of understanding of how to get out of the situation I was in," lack of "respect or empathy for other people's feelings," and because he did not understand "the nature of loss." Petitioner explained how he would have done things differently if he could go back in time and use the skills he has learned in prison. He testified against Bivert in another case even though he knew he "would be labeled a rat" because he "didn't stop him in the past and [he] figured, that was [his] chance to stop him from bringing harm to anybody else in the future." Petitioner explained how the victims' awareness offender program taught him the true impacts of his crimes, and he acknowledged the impacts to the victims' family members. Petitioner also understood the meaning of his dependent personality disorder.

Petitioner explained that, although low self-esteem sometimes "comes up," he stops to "reevaluate himself" and ask whether he is "doing the right thing," if there is "some benefit to it," and whether what he is doing is helping him or others. Petitioner further said "there's always going to be a need for acceptance, but I've come to the realization that as long as I know I'm doing the right thing and I'm on the right path . . . it's not really so much important to me anymore what . . . people think because . . . there's always someone else that's of positive mind that I could find that would support positive growth versus negative growth." Petitioner further responded to the deputy commissioner's hypothetical regarding the roommates' use of marijuana and alcohol by stating he would request to move to another apartment and would find new friends who

are supportive, uplifting, and living the right lifestyle, and people who can help him through the "dark spot[s]."

The foregoing portions of the record irrefutably establish that petitioner has significant insight into why he committed the life crime and has exhibited remorse. While there is some evidence that petitioner lacks *complete* insight, "[s]ome evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*In re Lee* (2006) 143 Cal.App.4th 1400, 1409.) The nexus to current dangerousness is critical. Our Supreme Court in "*Lawrence* and *Shaputis I* 'clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety -- not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' " (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 615.) " '[T]he proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 209.)

The Governor cites no evidence that petitioner's shortcoming in his insight is an indication of current dangerousness. (See *In re Morganti* (2012) 204 Cal.App.4th 904, 923, 925 [there must be some "*connection* between any lack of insight on [the inmate's] part and the conclusion that he is currently dangerous"].) "Accepting as we must, that an inmate's insufficient understanding of the causes of his crime is a factor that may show him unsuitable for parole, it is not enough to establish that the inmate's insight is deficient in some specific way." (*Id*. at p. 923.) There must be, in addition, some connection between the cited deficiency and the conclusion of current dangerousness. (*Ibid*.) There is no evidence in the instant record, however, of *any connection* between the deficiency in petitioner's insight and current dangerousness.

The circumstances in *Shaputis I* and *Shaputis II* stand in marked contrast. In those cases, the inmate shot and killed his wife. Despite years of therapy and programming, the inmate persisted in recounting a version of events that was factually unsupported or otherwise implausible. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260.) For example, his claim that he killed his wife by accident was contradicted by the facts the hammer of the gun had to be manually cocked before the trigger could be pulled and a transfer bar required a person to pull and hold back the trigger in order to fire the gun. (*Shaputis II*, *supra*, 53 Cal.4th at p. 201; *Shaputis I*, at pp. 1248, 1260.) There was also evidence showing he delayed in calling for emergency assistance for his wife and the murder was the culmination of years of violent and brutalizing behavior toward the victim, his children, and even his prior wife. (*Shaputis II*, at p. 201; *Shaputis I*, at pp. 1247-1248, 1259.) In addition, Shaputis had "found 'inexplicable' his daughters' prior allegations of molestation and domestic violence [and] had a flat affect when discussing these allegations." (*Shaputis I*, at p. 1252.)

In other words, there were specific facts supporting the conclusion Shaputis was not honest and forthright in claiming what had happened had been accidental, and his distortions all tended to minimize his culpability. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260 & fn. 18; see also *In re Hunter* (2012) 205 Cal.App.4th 1529, 1539-1540 [contrasting cases like *Shaputis* where inmate's account of the life crime "was 'physically impossible or strained credulity' "]; *In re Pugh* (2012) 205 Cal.App.4th 260, 273 [inmate's version of events that is "contrary to the facts established at trial and is inherently improbable" indicates a "refusal to admit the truth to himself and to others," and "establishes a nexus to current dangerousness because it indicates the inmate is hiding the truth and has not been rehabilitated sufficiently to be safe in society"]; *In re Ryner*, *supra*, 196 Cal.App.4th at p. 547 [Shaputis's lack of insight "was rationally indicative of current dangerousness because it showed that he had not accepted full responsibility for his crime"].)

31

As the *Shaputis* cases illustrate, a "lack of insight" into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. (*Shaputis I*, *supra*, 44 Cal.4th at pp. 1260, 1261, fn. 20; *In re Lawrence*, *supra*, 44 Cal.4th at pp. 1214, 1228.) "As distinct from the circumstances in *Shaputis*," the record here "demonstrates neither the type nor insufficiency of insight/failure to accept responsibility that would support an inference that [petitioner] will present a danger to the public if released on parole." (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 550.)

Because the Governor points to no evidence linking petitioner's issues with insight to an assessment of dangerousness, and we have found no evidence in the record to support such a finding, there is no basis to find petitioner unsuitable for parole.

## DISPOSITION

The Governor's decision reversing the Board's decision granting petitioner parole is vacated. The Board is ordered to release petitioner pursuant to the conditions set forth in its decision granting him parole, subject to the Board's authority to postpone or rescind petitioner's release pursuant to division 2, chapter 4 of title 15 of the California Code of Regulations. Considering the Board's decision to release petitioner would have been final on June 4, 2020, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

/s/
Robie, Acting P. J.

I concur:

/s/
Renner, J

32

MAURO, J., Dissenting.

Because I believe the record contains some evidence to support the Governor's denial of parole, I dissent from the majority opinion.

A

When reviewing a parole unsuitability determination, a court must consider the entire record in the light most favorable to the determination, to see if the record discloses "some evidence -- a modicum of evidence -- supporting the determination that the inmate would pose a danger to the public if released on parole." (*In re Shaputis* (2011) 53 Cal.4th 192, 214 (*Shaputis II*).) Although the "some evidence" standard is not toothless, it must not operate to " 'impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch.' " (*Id.* at p. 215.) The standard is more deferential than substantial evidence review, and may be satisfied by a lesser evidentiary showing. (*Id.* at p. 210.) In fact, a court may overturn the Governor's decision only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion. (*Id.* at p. 211.)

Although "the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide which evidence in the record is convincing." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211, italics omitted.) When "the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary." (*Id.* at p. 215.) Any relevant evidence that supports the

1

parole authority's determination is sufficient to satisfy the "some evidence" standard. (*Id*. at p. 214.)

A parole suitability decision is an " 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Shaputis II, supra*, 53 Cal.4th at p. 219.) "Past criminal conduct and current attitudes toward that conduct may both be significant predictors of an inmate's future behavior." (*Ibid*.) While subjective analysis is an inherent aspect of the parole suitability determination, it plays a proper role only in the parole authority's determination. (*Ibid*.) The reviewing court does not ask whether the inmate is currently dangerous. (*Id*. at p. 221.) "Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Ibid*.)

However, nothing in the requirement that a parole denial be accompanied by a statement of reasons demands that the parole authority comprehensively marshal the evidentiary support for its reasons. (*Shaputis II, supra*, 53 Cal.4th at p. 214, fn. 11.) Appellate review for some evidence supporting the parole authority's decision extends to the entire record, and is not limited to the evidence specified by the parole authority. (*Ibid*.)

B

Here, as the majority notes, the Governor reversed the Board's decision because, in his view, petitioner "is still not able to articulate a deep understanding of the causative factors of the crime, and has not yet developed the tools to avoid returning to his dependent behavior." Some evidence supports this conclusion.

2

Petitioner was with Kenneth Bivert when Bivert shot Steve Patton with petitioner's shotgun. (*People v. King* (1991) 1 Cal.App.4th 288, 291.) Petitioner and Bivert took Patton's truck and later drove it into a slough to conceal it. (*Id*. at p. 292.) Petitioner then agreed to rob a bank, accepted a firearm from Bivert, and eventually agreed to shoot Raymond and Dawn Rogers in an effort to steal their car. (*Id.* at pp. 290, 293-294.) There is evidence petitioner shot Raymond and Dawn. (*Ibid*.) Petitioner took money and keys from Dawn's purse and pulled the bodies into the water. (*Ibid*.) Although petitioner expressed fear of Bivert and also expressed a need to belong and fit in with people who were not always a good influence (*Id.* at pp. 293-295), it was not arbitrary for the Governor to question petitioner's current insight into the causes of the murders given that petitioner has yet to explain the extent of his callousness. In fact, the evaluating psychologist said that petitioner struggled to explain why he would stay with Bivert for several days after the first murder. The psychologist said petitioner attributed it to fear, but that did not make sense to the psychologist given the period of time between the first and second murders. The psychologist said petitioner demonstrated issues related to his insight, but ultimately concluded the issues were of low relevance. The Governor, however, was free to conclude that the insight issues were of higher relevance. As the majority notes, a lack of insight into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1260-1261, & fn. 20 (*Shaputis I*); *In re Lawrence* (2008) 44 Cal.4th

3

1181, 1214, 1228.) In making its subjective suitability determination, the parole authority must have the discretion to consider a petitioner's limited understanding of his crime and the ways in which he could avoid future antisocial acts if released on parole. (*Shaputis II, supra*, 53 Cal.4th at pp. 217-218 [the inmate's "degree of insight" into his or her criminal behavior is a factor in parole suitability determinations]; *Shaputis I,* at pp. 1251, 1253, 1260-1261 [upholding the Governor's decision to deny parole based in part on the inmate's lack of sufficient insight].)

Moreover, to the extent petitioner has been susceptible to peer pressure to a greater degree than other youth, there is some evidence such susceptibility remains a concern. As the Governor noted, an evaluating psychologist opined that the "constellation of symptoms [presented by petitioner], although somewhat mitigated at this time, are consistent with features of Dependent Personality Disorder." Those symptoms include: "submissiveness, lack of confidence requiring the assurance of others, difficulty disagreeing with others, fear of disapproval, going to excessive lengths to obtain support, pessimism, and self-doubt." In the psychologist's opinion, "[t]hese features were contributing factors to the life crime, and were particularly salient in his adolescence and early adulthood. Although Mr. King has worked to mitigate these characteristics, they are entrenched features, and remain moderately relevant." The psychologist further noted that petitioner is vulnerable to the influences of negative peers, which was a contributing factor to the life crime. Given petitioner's history, the psychologist believed his vulnerability to negative peers "remains moderately salient and could have great significance should he return to associating with negative influences."

4

Because there is a rational nexus between the evidence and the ultimate determination of current dangerousness, I would affirm the trial court's denial of petitioner's petition for writ of habeas corpus challenging Governor Newsom's decision to reverse the Board of Parole Hearings' grant of parole.

/s/_____
Mauro, J.